Mullendore *v.* State.

(*Knoxville*, September Term, 1945.)

Opinion filed December 1, 1945.

O. L. McMahan, of Morristown, for plaintiff in error.

Nat Tipton, Asst. Atty. Gen., for the State.

Mr. Justice Gailor delivered the opinion of the Court.

In the Criminal Court of Hamblen County, the defendant, Charles Mullendore, who appeals, was found guilty

of murder in the first degree and sentenced to life imprisonment in the penitentiary.

There is little controversy about the material and essential facts of the crime as the defendant did not take the stand, and the account of the actual homicide comes from the testimony of a single eyewitness and co-defendant, James Burnett, Jr., who was jointly tried and convicted as an accessory, but who has not appealed.

Defendant was employed at a roadhouse called the Blinky Moon, some miles from Morristown in Hamblen County, and on the evening of December 1, 1944, there was dancing in the roadhouse and a poker game in a nearby cabin. Burnett attended the dance, and early in the evening was arrested and taken to jail, but later released and returned to the Blinky Moon before midnight.

Herman (Luke) Ward and Horace Kite, coming from their homes in Hawkins County, after drinking at other roadhouses along the way, arrived at the Blinky Moon about midnight. Ward was employed by Kite in his business of hauling coal and other commodities, and assisted him in the operation of a small store in Hawkins County. Kite was driving a four-door Plymouth sedan and Ward was his only companion on his arrival at the Blinky Moon.

Early in the morning of December 2, 1944, both of these men were killed by Mullendore, but the appeal is only from the conviction in the case of Ward. When Kite and Ward arrived at the Blinky Moon they had several drinks in which Mullendore joined them. Burnett was present in the room but was sitting apart near the stove and did not drink.

At about 12:30 p. m., State's witness Wester, who was playing poker in the cabin, leaving the game, came into the Blinky Moon to get a check cashed. Apparently

Mullendore refused to cash the check but Kite took out his billfold and made a personal loan to Wester of $100. When this occurred, Mullendore was standing a few feet away and had opportunity to see the billfold and gauge its contents. From the appearance of the billfold, it was evident that there was a considerable sum of money left in it after the loan.

Wester testified that about thirty minutes after his return to the poker game, Mullendore came to the cabin and was sent to Morristown for coffee and sandwiches; that he had no money and was given $5 to pay for the trip and secure the sandwiches.

While Mullendore was in the cabin, Kite, Ward and Burnett had left the Blinky Moon and got into the Plymouth car preparing to go to Morristown. Mullendore, who had not theretofore evinced any intention of leaving the Blinky Moon, came to the car and asked Kite for a ride to town. He was taken in on the rear seat with Burnett. Kite was driving with Ward sitting by him on the front seat. Burnett was sitting behind Kite with Mullendore on the rear seat.

On leaving the Blinky Moon, instead of driving directly to Morristown, Kite went in the opposite direction to another roadhouse, "Billie's Place," where the operator was aroused and other drinks consumed by Kite, Ward and Mullendore. Up to this point, the relations between all members of the party were entirely friendly. Kite was then so drunk that Burnett asked to be allowed to drive but Kite refused. They set out for Morristown with Kite still driving and from then on, his driving was extremely reckless and uncontrolled. Mullendore protested at the way he was driving several times, and finally, when Kite ran off the road and nearly overturned the car, Mullendore said, "Slow down, or you will kill us all,"

to which Kite replied, "If you don't like the way I drive you get out of here," and stopped the car. Ward then said, "I will help you put him out."

Thereupon Mullendore drew his pistol and shot Kite and Ward in the back of the head six times, alternately shooting first Kite and then Ward. From the fact that all six bullets struck the victims in the back of the head, it is evident that neither Kite nor Ward had turned or started to get out of the car.

Mullendore then, without delay or pause for reflection, got out of the back seat, went up to the front on the driver's side, pushed the two bodies over against the right front door, and drove off toward Morristown. He said nothing during or after the shooting, but before reaching the town he took a lateral road leading to the bridge over Cherokee Lake, and arriving on the bridge over the deepest water of the old river channel, he stopped the car. He then pulled Ward's body out of the car and threw it off the bridge into the water. He next dragged Kite's body out of the car, and without search or hesitation, took the billfold out of Kite's pocket, removed the money it contained, and replaced the billfold. Kite weighed about 195 pounds and Mullendore could not handle him alone, so he forced the terrified Burnett to help him throw Kite's body after Ward's.

After threatening to kill Burnett if he didn't keep his mouth shut, Mullendore drove on into Morristown and parked the car in front of the courthouse. At a point along the way, he let Burnett out with instructions to get a taxi and meet him at the courthouse. This Burnett undertook to do, but missed Mullendore at the courthouse, and returned to the taxi lot, where he and the taxi driver waited until Mullendore walked up and joined them.

Mullendore sent the taxi driver for sandwiches and coffee and then instructed him to drive back to the Blinky Moon. They let Burnett out at his home on the way. On arriving at the Blinky Moon, Mullendore paid the taxi driver and went into the cabin, where the poker game was still in progress, to deliver the sandwiches and coffee. Somebody in the game asked Mullendore about blood-stains on his clothes. He went away, changed his clothes, brought back the bloodstained clothes and shoes and burned them in the stove in the cabin. Metal parts of clothes and shoes were later found in the ashes of the stove and introduced in evidence. Mullendore also went out from the cabin in the nearby woods and hid the pistol, which was also found and introduced. Having taken these steps to prevent detection, he went to sleep in a chair in the cabin where the game was in progress or "passed out" from the drinks he had taken.

The sequence of events and the lapse of time after Mullendore's return to the cabin with the sandwiches is not definitely clear from the record, because it is taken from the testimony of several of the witnesses who were playing poker. The game went on until 6:30 or 7 o'clock in the morning, so that there is no evidence to exclude the conclusion that Mullendore drank himself into a stupor after returning from Morristown. One witness testified that he finally went to sleep in a chair from the effects of the drinks he had taken. We consider his mental condition before, at, and immediately after the shooting later in the opinion.

On December 10, some nine days after the crime, the bodies of the victims were recovered from the lake, and earlier the Plymouth car had been found by the Sheriff and identified by Kite's widow, who testified that he had

had $350 in his pocketbook on December 1st, when he left his home in Hawkins County.

. As stated, the defendant did not testify. The account of the actual homcide is that of Burnett, who was not unfriendly to Mullendore, but as a codefendant, was testifying in his own behalf. He was convicted as an accessory after the fact and did not perfect an appeal.

On his appeal, the defendant Mullendore makes the following assignments of error:

''1. That there was no evidence to support the verdict of the jury.

''2. The evidence preponderates in favor of the innocence of the defendant and against the verdict of the jury.

''3. The verdict of the jury was so excessive and un-· reasonable as to indicate passion, caprice and prejudice on the part of the jury.

''4. The defendant, Charles Mullendore, was drunk to such an extent at the time Ward was fatally shot that he was incapable of commiting murder in the first degree.''

■■ On this record, the first three assignments are so obviously made as a matter of form that we think they require no further consideration than the undisputed. statement of the facts of the crime as we have set them out and found them. Under the rule often stated by this Court, *Freddo* v. *State,* 127 Tenn. 376, 155 S. W. 170, 44 L. R. A. (N. S.), 659, ''provocative words'' will not justify even a simple assault. On the testimony of Burnett, which is corroborated to a certain extent by the fact that the three bullets entered the back of Ward's head, all that Ward did to provoke Mullendore was his remark to Kite, ''I'll help you put him out.'' Argument that the shooting was in self-defense is unsupported by

any vestige of evidence. The first three assignments are overruled.

■ ■ The fourth assignment, we think merits additional consideration. Since the law presumes sanity, the burden is on defendant to show insanity, voluntary or involuntary (*King* v. *State*, 91 Tenn. 617, 646, 20 S. W. 169; *Stuart* v. *State*, 60 Tenn. 178; *Dove* v. *State*, 50 Tenn. 348, 370, 371), to make such insanity effective as a defense or in mitigation of crime. Drunkenness, wilfully induced, to be effective to reduce a murder from first to second degree, must be so complete that at the actual moment of the commission of the crime the defendant's senses are so stupified by drink that he is incapable of forming a premeditated and deliberate design to kill. *Buxton* v. *State*, 89 Tenn. 216, 14 S. W. 480.

■ The undisputed words and acts of the defendant immediately before, at, and immediately after the killings, are the best evidence of whether he was or was not of rational mind at the time of the crime. Immediately before the shooting, defendant was aware of the danger of Kite's driving and caused him to stop the car by saying in a most reasonable way, "Slow down or you will kill us all." He handled the pistol with precision and design, shooting first one and then the other occupant of the front seat. The repeated shots clearly indicate a definite intent to kill, not merely to injure. Defendant wished to kill so that he could carry out the rest of a preconceived plan. With no pause for reflection, after the shooting, he took over the driver's seat and drove without difficulty or indecision, along the highway to the place where the highway joined the smaller lateral road. He drove along that lateral road to the point on the bridge most suitable for the disposal of the bodies, and there parked the car. He threw Ward's body over with-

out searching it for money. When he had pulled Kite's body out of the car, he did not search it, but took the pocketbook from the pocket where it was, extracted the money and returned the pocketbook, before disposing of the body. He, threatened Burnett with death if he did not keep his mouth shut. He then drove to Morristown, and parked the car in such a public place that being surrounded by other cars during the hours when the streets are in use, it might well have escaped attention for several days. He thus showed that he appreciated the danger of attracting attention to the car by abandoning it on a country road. We think all these are the acts of a reasoning, clear and planning mind; certainly not those of a mind insensate and stupified.

■ The positive evidence of the taxi driver Boatman, who saw defendant a few minutes after the killing, is that defendant was then not drunk. Wilson, who saw him when he returned to the poker game at the cabin, testifies to the same effect. We think the jury's refusal to accept the argument of defendant's drunkenness was supported by a preponderance of the evidence, and that, therefore, the fourth assignment must be overruled.

■■ Though there was no formal plea of present insanity, some evidence to show insanity at the time of the commission of the crime was introduced under the general issue. Defendant's mother testified to several cases of insanity in the family, but her testimony was vague and indefinite as to type and time. A psychiatrist was introduced on behalf of defendant, testified that defendant was insane. He had made an examination of defendant for about thirty minutes some two weeks before the trial. He kept no record of the examination and could not even be exact about the date of its making. His admissions on cross-examination showed that the ex-

amination was casual and incomplete. He showed himself an advocate rather than a dispassionate expert, and the jury was justified (when they weighed his testimony, as they had a right to do, *Haskins* v. *Howard*, 159 Tenn. 86, 16 S. W. (2d) 20) in concluding that he was *employed* rather than called for the defense. The attitude of obvious partisanship displayed by this nominally expert witness, furnishes convincing evidence of the wisdom of the rule laid down by this Court, that expert testimony is to be received "with great caution;" (*Fisher* v. *Travelers Insurance Co.*, 124 Tenn. 450, 505, 138 S. W. 316, 330, Ann. Cas. 1912D, 1246; *Wilcox* v. *State*, 94 Tenn. 106, 28 S. W. 312) and that the weight to be given it is a question for the jury under careful instruction of the trial judge. *Haskins* v. *State, supra.* The actions and words of defendant before, at, and immediately after the commission of the crime, were as convincing evidence of his sanity as they were of his sobriety, so we feel the jury had material evidence on which to disregard the opinion of the expert witness.

 Finally, from a careful study of the record, we find the jury's verdict of murder in the first degree was justified by the evidence on either of two theories: (1) That the homicide was committed in perpetration of robbery and was, therefore, murder in the first degree under Code, sec. 10768; or (2) that on the evidence, the killing was wilful, deliberate, malicious and premeditated in view of defendant's undisputed acts before, at, and immediately after the shots were fired. Counsel insists that to find malice and premeditation, neither this Court nor the jury may look to defendant's actions immediately after the killing. Though we have no direct authority on this proposition in Tennessee, the great weight of

authority from textbooks and the courts of last resort in other states is to the contrary.

"And evidence that a person took the property of another after killing him, and appropriated it to his own use, is sufficient to sustain a conviction of murder in an attempt to commit a robbery, though no previous purpose to rob appears, since his act raises a strong presumption that he intended to do what he afterwards voluntarily did." Wharton on Homicide, 3d Ed., 188.

In a case very similar on the facts where the murder was committed in an automobile, the body robbed and then hidden in an abandoned well, affirming a conviction of murder in the first degree, the Supreme Court of North Carolina said, in part:

"We come now to the three exceptions raising the question, whether what occurred immediately after the homicide is evidence of premeditation and deliberation on the part of the prisoner.

"There are authorities for the position that any unseemly conduct toward the corpse of the person slain, or any indignity offered it by the slayer, and also concealment of the body, are evidence of express malice, and of premeditation and deliberation in the slaying, depending of course, upon the particular circumstances of the case. *State* v. *Robertson*, 166 N. C. 356, 81 S. E. 689; *People* v. *Beckwith*, 108 N. Y. 67-75, 15 N. E. 53; *Commonwealth* v. *Umilian*, 177 Mass. 582, 59 N. E. 439; *Commonwealth* v. *Best*, 180 Mass. 492, 62 N. E. 748; *State* v. *Dickson*, 78 Mo. 438; *Duncan* v. *Commonwealth*, *Ky.*, 12 S. W. 673; 21 Cyc., pp. 897, 898." *State* v. *Westmoreland*, 181 N. C. 590, 594, 107 S. E. 438, 441.

For the reasons stated, all assignments of error are overruled and the judgment is affirmed.