**STATE of Tennessee, Appellee,**

v.

**Ronald Richard HARRIES, Appellant.**

Supreme Court of Tennessee, at Knoxville.

Sept. 19, 1983.

William M. Leech, Jr., Atty. Gen., Wayne E. Uhl, Asst. Atty. Gen., Nashville, for appellee.

Frank P. Miller, Icenhour, Wohlford & Miller, Bristol, Carl W. Eilers, Kingsport, for appellant.

## OPINION

FONES, Chief Justice.

Defendant appeals from a conviction of murder in the first degree and sentence of death.

This case is unusual in that defendant testified that he killed the victim in the course of robbing a Jiffy Market in Kingsport. While his appointed counsel resisted vigorously every aspect of the State's case, the only defense affirmatively asserted was that defendant was a drug addict, being manipulated by Ralph Page and Charles Stapleton, his drug suppliers, and that the bullet that killed the eighteen-year-old clerk in the Jiffy Market was fired accidentally. It was insisted that defendant was guilty of second degree murder or a lesser degree of homicide.

Rhonda Greene, the victim, and her cousin Elizabeth Lane, were the only employees working at the Jiffy Market when the robbery and murder occurred at approximately 9:30 p.m. on January 22, 1981. Defendant watched Scott Fletcher, a customer enter the store and could see that he was the only customer in the store. Defendant entered the store behind Fletcher, apparently unobserved by anyone, and proceeded to the most remote area from the checkout counter until Fletcher left. Elizabeth Lane was in a rear room filling a mop bucket but could see part of the shopping area of the store through a window in the door between the two areas. She knew Fletcher and knew that he was in the store and she saw him leave but she did not know anyone else was in the store. Very soon after Fletcher left she heard Rhonda scream, "Oh my Lord," and heard a gunshot. She ran through the door and defendant shot at her, but missed. Defendant then told her to give him the money or he would kill her. She gave him three bags from the safe containing checks, food stamps and approximately fifteen hundred dollars in cash.

Defendant left the Jiffy Market and ran to a waiting car that, according to him, was driven by Ralph Page, who drove him to Stapleton's mother's house where defendant and Stapleton were staying. The following day Page, Stapleton, and defendant drove to North Carolina where Page had relatives. Page and Stapleton received part of the money taken in the robbery. Page and defendant drove on to Florida where defendant was apprehended.

An autopsy was performed on Rhonda Greene and the pathologist testified that she was killed by a single gunshot wound to the head. He removed the bullet from the back of her head, it was duly identified as was the murder weapon, and a ballistics expert testified that the fatal bullet was fired from the gun shown to have been used by defendant in the robbery-murder. While defendant was waiting for Fletcher to leave the store he had picked up a box of Little Debbie Oatmeal Cream Pies and brought them to the check-out counter where they were left. A fingerprint expert

testified that three of defendant's fingerprints were on the box. Scott Fletcher testified that he heard both gunshots as he was getting in his car to leave the Jiffy Market parking area. Earlier he had seen defendant walking from across the street toward the market as he waited for a stoplight to change before driving into the store driveway. Upon hearing the shots Fletcher looked through the store window, saw defendant with a gun and ran off toward the intersection shouting for help. Both Fletcher and Elizabeth identified defendant as the robber and murderer. In short, the State proved every element of the crime of first degree murder beyond a reasonable doubt, prior to defendant's testimony admitting that he robbed the market and shot Rhonda Greene.

## I.

The first two issues raised by defendant question the sufficiency of the evidence to support a conviction of murder in the first degree. Defendant says, in essence, that the shooting was accidental, caused by the activities of Scott Fletcher surprising defendant and that he was under the influence of drugs and alcohol to the extent that he did not knowingly or intentionally fire the bullet that killed Rhonda Greene.

The State's theory was that defendant was watching and waiting for the opportunity to rob the store when only one clerk was present and that he intended to kill her so that no one could identify him. Among defendant's prior convictions the State contended that he had twice been identified in the perpetration of robberies and sought to avoid that result in the Jiffy Market robbery. Ms. Lane testified that Todd Green, Rhonda's brother, had been in the store just prior to Scott Fletcher's arrival; that he was similar in size, dress and hairstyle to Ms. Lane; that she had loaned him her jeep to deliver milk to a customer and he had departed just before Fletcher entered and did not return until after defendant had fled. The State relied upon that combination of circumstantial evidence to infer that defendant believed that the second clerk,

Ms. Lane, had left in the jeep and Rhonda would be the only witness to the robbery. Thus, contended the State, he deliberately executed her to avoid being identified.

Defendant testified at length about his addiction to drugs and his acquaintance with Page and Stapleton. Defendant's counsel fairly summarized his testimony in the brief on his behalf, as follows:

That in late November or early December, he was a Federal prisoner in a halfway house and that while serving there, he left the halfway house and went to Cleveland, Ohio where he met Charles Wade Stapleton. He further testified that Stapleton introduced him to Ralph Page, Ralph Page being from Kingsport, Tennessee, and that Ralph Page was instrumental in the Appellant coming to Kingsport. The Appellant further testified that he had never been in Tennessee prior to this trip and that on January 21, 1981, he and Charles Stapleton left Cleveland, Ohio in the early morning hours in Stapleton's truck and that he drank and took drugs during the trip to Kingsport and that they arrived in Kingsport in the early evening. He further testified that they went to Stapleton's mother's residence, stayed a while, then went to the residence of Carolyn Griffin where he stayed and slept while Stapleton and Carolyn Griffin went out for a couple of hours. He further testified that Stapleton observed him taking drugs, both on the trip down and at his mother's home in Kingsport and that these drugs were amphetamines, including preludins and black beauties. He further testified as to his prior criminal record which involved an armed robbery and kidnapping and an unarmed robbery and a mail fraud scheme while he was in the penitentiary and for which he was serving a sentence when he walked off from the halfway house. He further testified that he had acquired a massive drug habit and that the funds, $16,000.00, which were made through the mail fraud scheme were used to buy drugs and liquor while he was in the penitentiary in Ohio. He further testified that on the morning of January 22

when he awoke in Carolyn Griffin's home he continued to drink at her home and when they returned to Stapleton's mother's home, that he continued to take a few hits of speed and drink during the day.

The Appellant further testified that that evening when Stapleton left, he was picked up by Ralph Page and that they were suppose to go cash some traveler's checks which were issued in the name of C. Dallas Cottrell and that Page furnished the pistol and drove the Appellant around Kingsport looking for a market to rob and that the aforesaid Ralph Page picked out this Jiffy Market for the Appellant to enter and rob.

Appellant testified that when he approached the Market, he was aware that there [sic] two (2) clerks in the Market and that he followed the witness, Scott Fletcher, into the Market and went to the rear of the Market while Fletcher finished his transaction. He further testified that when he approached the counter and put the box of cookies on the counter, he had the gun out and it was cocked and that he told the deceased that it was a robbery and that Scott Fletcher turned and ran towards him or made some movement which caused the gun to go off and kill Rhonda Leslie Greene. He further testified that when Elizabeth Lane came out of the back room, his shot at her was an automatic reflex caused by panic and fear. He testified that he was high on drugs and liquor at the time and hyperactive, and this was substantiated by the testimony of the witness, Elizabeth Lane, who testified that the Appellant was running around the opposite side of the counter hollering get me the money or I will kill you and he appeared to be highly nervous.

Appellant further testified that Page picked him up after he ran from the Market and took him to Stapleton's home where he divided the money and gave some to Stapleton and took some to Ralph Page after Stapleton returned and took the Appellant to Page's home. He testified that the following day he contin-

ued to drink and take drugs and that he, Stapleton, and Ralph Page went to North Carolina where the small bills were exchanged for $100.00 bills and that certain work was done on Page's car and the gun was traded for a set of tires for Stapleton's vehicle.

The three men then returned to Kingsport and Page and the Appellant left and drove to Tampa, Florida with the Appellant's testimony being that enroute they stopped several times to cash traveler's checks with a false I.D. which had been furnished by Ralph Page. The Appellant was arrested in Florida and waived extradition to Tennessee.

Stapleton, testifying for defendant, described defendant as a drug addict and heavy drinker and related a large quantity of drugs, beer and whiskey that he said defendant had consumed on January 21 and January 22, 1981. Stapleton had been convicted of second degree murder and sentenced to fifty years for his participation in the robbery of the Jiffy Market and murder of Rhonda Greene. On cross examination it was shown that he had given several statements to the police, none of which described defendant as being under the influence of drugs or alcohol. He acknowledged that he had lied in the statements and affirmatively asserted that it was appropriate to lie to the prosecution. His conduct as a witness was blatantly contemptuous of the prosecution and the Court.

A witness for the State, Carolyn Griffin, testified that Stapleton, her uncle, and defendant visited her residence the night before the robbery-murder and again about eleven p.m. on the night of the robbery-murder. Defendant gave her some food stamps and she said that other than being nervous he did not appear to be intoxicated or under the influence of drugs.

In rebuttal the State called Mike Gardner, Sheriff of Sullivan County. Gardner testified that when he went to Tampa, Florida to return defendant to Tennessee he examined defendant there for needle marks and did not find a single one on his body.

This was in direct contradiction of defendant's testimony that he was shooting preludin into the veins of his arms throughout the time he was in Kingsport and on the way to Florida.

■ Based upon defendant's own testimony that appeared to recall every detail, the jury could have found that neither his actions nor his intent or motivation were impaired by alcohol or drugs. Defendant's own testimony falls far short of establishing that he was intoxicated or drugged to the extent that he was incapable of forming an intent to rob or kill. *See, State v. Bullington,* 532 S.W.2d 556 (Tenn.1976); and *Mullendore v. State,* 183 Tenn. 53, 191 S.W.2d 149 (1945).

■ Defendant was indicted for felony murder and the State's evidence, exclusive of defendant's testimony, was such that any rational trier of fact could have found defendant guilty of all the essential elements of felony murder beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); T.R.A.P. 13(e).

■ While superfluous, we think it clear that there was ample evidence beyond a reasonable doubt upon which defendant could have been convicted of deliberate premeditated murder.

## II.

■ Next defendant says that the allowance by the Court, even with appellant's concurrence, of still cameras and TV coverage, asserted undue influence on the jury, either consciously or subconsciously, thus depriving the appellant of a fair trial.

Defendant not only did not object to media coverage but affirmatively agreed to it. If defendant had objected to coverage, it would be necessary that he show that the presence of cameras impaired the jurors' ability to decide the case only on the evidence or that the trial was adversely affected by the impact of media coverage on one or more of the participants. *Chandler v. Florida,* 449 U.S. 560, 581–82, 101 S.Ct. 802, 813, 66 L.Ed.2d 740 (1981). The record is devoid of any attempt to make such a showing.

## III.

■ Defendant insists that it was error to allow ten members of the jury to be impaneled who had heard a comment by a prospective juror, Mary Slemp, to the effect that she had heard news coverage which purported to inform the public that the appellant would be tried as a habitual criminal. Appellant avers that this contaminated the jury to such an extent that even in spite of his agreement, there was denial of a fair trial for him.

In answer to a question by the Court whether anyone had "read or heard anything about the case since yesterday," Mary Slemp said, "I heard on the radio going home about—something about him taking drugs and—the habitual criminal part, too." Defendant agreed that the jurors who had heard the statement could be recalled and instructed to ignore and disregard Mrs. Slemp's statements. All indicated that they could do this. Only five of the jurors involved served on the final jury. When defendant testified, he told of his drug addiction and on cross examination his long criminal record was properly brought to the jury's attention, rendering absolutely harmless anything said by Mrs. Slemp during jury selection.

## IV.

■ Defendant asserts that the trial judge excused for cause a number of jurors when in fact just cause for excusal had not been shown. Defendant implicitly acknowledges that none of the instances relied upon violated the mandate of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), but says the dismissals were contrary to, "a justifiable extension of *Witherspoon, Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); and *State v. Harrington,* 627 S.W.2d 345 (Tenn. 1981)." Most of the jurors specifically referred to by defendant were dismissed because they had formed an opinion as to the

guilt or innocence of defendant. Defendant says the trial judge failed to elicit exactly what the jurors' opinion was and concluded that this was to the detriment of defendant. Our reading of the voir dire examination of those jurors convinces us that the jurors' opinions, based in most instances on their exposure and recollection of publicity about the case, were that defendant was guilty. Their excusal was rather clearly beneficial rather than detrimental to defendant.

Rule 24(b)(2) of the Tennessee Rules of Criminal Procedure provides as follows:

(2) the prospective juror's exposure to potentially prejudicial information makes him unacceptable as a juror. Both the degree of exposure and the prospective juror's testimony as to his state of mind shall be considered in determining acceptability. A prospective juror who states that he will be unable to overcome his preconceptions shall be subject to challenge for cause no matter how slight his exposure. If he has seen or heard and if he remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his judgment will be affected, his acceptability shall depend on whether his testimony as to impartiality is believed. If he admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows unequivocally that he can be impartial.

The trial judge's dismissal of prospective jurors for cause, complained of by defendant were clearly justified under the guidelines set forth in the above quoted rule. Also, defendant failed to contemporaneously object to any of the dismissals[1] and therefore waived appellate review. *State v. Pritchett,* 621 S.W.2d 127, 135 (Tenn.1981).

■ Defendant complained that the trial judge improperly "rehabilitated" prospective jurors by "interposing statements or questions" from time-to-time. No specific instance is cited and the issue is not entitled to appellate review. However, we note that the trial judge was meticulously careful, patient and fair in the conduct of the voir dire. On several occasions he found it necessary to correct erroneous impressions that defense counsel's statements and questions were creating, which was no doubt the source of defendant's "rehabilitation" complaint.

■ Defendant also complains that it was error for the trial judge to allow the State to exercise a peremptory challenge and dismiss prospective juror Blake. The reason given was that Blake "was excused by the State after a lengthy examination by both sides and the Court relative to his feelings about capital punishment." Juror Blake did not know how he felt about capital punishment and the State exercised one of its peremptory challenges which it had the right to do and the trial judge was without authority to deny that right.

## V.

■ Defendant says the trial judge erred in admitting four photographs. Two were black and white pictures, one of which pictured the countertop between the two cash registers where Rhonda was standing when shot. Spots of liquid are visible that were identified as blood, but from the picture itself they could have depicted ink or coca-cola. The other picture shows the tile floor behind the counter where the victim fell and a small pool identified as blood that was left after the body was removed. Those pictures were relevant to give the jury a picture of the crime scene that included the location of the Little Debbie Oatmeal Cream Pie box that had defendant's fingerprints on it and the relative locations of the cash register and the door to the rear room where Elizabeth Lane was when Rhonda was murdered. Nothing gruesome or prejudicial to defendant appears in either of those black and white photographs and their admission did not

---

1. In the instance of juror Going, counsel for defendant said they would "prefer" that she

not be excused.

violate any of the guidelines of *State v. Banks,* 564 S.W.2d 947 (Tenn.1978).

■ Defendant also objected to introduction of portrait type pictures of Elizabeth Lane and of the victim Rhonda Greene. Ms. Lane's picture and a picture of Todd Greene were admitted to show the resemblance between Elizabeth and Todd, who left in Elizabeth's jeep wearing her coat, to support the State's theory that defendant thought only one person remained in the store when defendant shot the victim. There is simply no basis for a finding that those photographs would generate sympathy or in any way be prejudicial to defendant. There is no merit whatever to defendant's contentions in regard to the four photographs.

## VI.

■ Defendant complains of the admission of a conviction of defense witness Stapleton for impeachment purposes. Stapleton was convicted of aiding and abetting second degree murder in February 1971 with a sentence of three to twenty years. He was released from prison in February 1977 and this trial was held in August 1981. Defendant contends that under *State v. Morgan,* 541 S.W.2d 385 (Tenn.1976), admission of said conviction violated the ten year rule and that no advance written notice of intent to use that evidence for impeachment purposes was given. There is no merit to either contention. The rule adopted in *Morgan* clearly provided that the ten year period starts to run from the date of conviction *or* of the release of the witness from confinement, whichever is later, and that advance written notice is required only when the conviction is more than ten years old and it is insisted that in spite of its age the probative value of the conviction outweighs its prejudicial effect.

## VII.

■ Defendant says it was error for the district attorney in closing argument after the sentencing hearing to tell the jury that this was only the seventh time in fifteen years that he had asked for the death penalty. The trial court immediately interrupted the district attorney's argument and instructed the jury that that statement was completely outside the record and they should disregard it and give it no weight whatsoever. The district attorney's statement was clearly improper but the prompt action by the trial judge prevented any prejudice to defendant in our opinion. The evidence of guilt and of aggravating circumstances was overwhelming and the error was of a minor nature and harmless beyond a reasonable doubt.

## VIII.

Defendant says that in the sentencing phase of the trial the statute allowing the State to introduce hearsay evidence of aggravating circumstances shifts the burden of proof to defendant and is vague and requires that a defendant prove his right to live in violation of the Fifth and Fourteenth Amendments to the United States Constitution. This Court has heretofore upheld the Tennessee death penalty statute from similar attacks on its constitutionality in *State v. Austin,* 618 S.W.2d 738 (Tenn.1981), and *State v. Dicks,* 615 S.W.2d 126 (Tenn.1981), and other cases.

## IX.

■ Defendant says the trial judge erred in admitting during the sentencing phase evidence of conviction of two crimes that did not involve the use or threat of violence to the person, robbery and mail fraud. In the case of the robbery the victim testified that she was placed in fear because the defendant's hand was in his pocket in a manner indicating that he had a weapon. With respect to the mail fraud scheme that he perpetrated while in federal prison to finance his drug habit to the extent of $16,000, defendant himself first brought this to the attention of the jury during the guilt phase of the trial in furtherance of his defense of drug addiction. While the mail fraud conviction was immaterial and ineffective to prove the aggravating circumstances that defendant had previously been convicted of one or more

felonies involving the use or threat of violence to the person, its introduction was not prejudicial to defendant in the circumstances here and harmless beyond a reasonable doubt.

The conviction of murder in the first degree and the sentence of death imposed by the Criminal Court of Sullivan County are affirmed. The death sentence will be carried out as provided by law on the 28th day of December 1983, unless stayed by appropriate authority. Costs are adjudged against defendant.

COOPER and HARBISON, JJ., and DUNCAN, Special Justice, concur.

BROCK, J., concurs in part; dissents in part.

BROCK, J., concurring in part; dissenting in part.

With respect to the constitutionality of the death penalty, I adhere to the views expressed in my dissenting opinion in *State v. Dicks,* Tenn., 615 S.W.2d 126, 132 (1981); in all other respects I concur in the opinion of the Court.