# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 5, 2011

## STATE OF TENNESSEE v. MICHAEL SMALL

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-00913, 01-00914     John T. Fowlkes, Jr., Judge**

---

**No. W2009-00858-CCA-R3-CD  - Filed May 2, 2012**

---

A Shelby County jury convicted the defendant, Michael Small, of two counts of aggravated robbery, Class B felonies, in case number 01-00913 and two counts of aggravated robbery, Class B felonies, in case number 01-00914.  In each case, the trial court merged the convictions and sentenced the defendant as a Range II, multiple offender to twenty years in the Tennessee Department of Correction.  The trial court ordered the defendant to serve his sentences in 01-00913 and 01-00914 concurrently with each other and consecutively to the defendant's sentence in 01-00926.  On appeal, the defendant argues that the trial court erred by (1) finding that the defendant's right to a speedy trial had not been violated; (2) not striking the jury venire after a prospective juror's outburst; and (3) not declaring a mistrial after the jury indicated it could not reach a unanimous verdict.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Lance R. Chism (on appeal), and Larry Copeland (at trial), Memphis, Tennessee, for the appellant, Michael Small.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman, Rachel Newton and Chris West, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

# FACTS

On January 20, 2001, a Shelby County grand jury indicted the defendant in case number 01-00913 on two counts of the aggravated robbery of Jewel Wilson, a Class B felony. On the same day, the grand jury indicted the defendant in case number 01-00914 on two counts of the aggravated robbery of Matthew Tiscia,[1] a Class B felony. The grand jury also charged the defendant in several other indictments. Authorities arrested the defendant in February 2002. His trial in case numbers 01-00913 and 01-00914 began on April 14, 2008. On the first day of the trial, the defendant moved to dismiss his indictments based on a violation of his right to a speedy trial. The trial court took the matter under advisement.

## Trial Testimony

Jewel Wilson testified that she was working at the CK Coffee Shop at 3530 Summer Avenue in Memphis, Tennessee, on April 17, 2000. She said that there was only one customer in the restaurant, Mike Tiscia, when a man she later identified as the defendant came into the restaurant and approached the counter. Ms. Wilson said that the defendant took a menu and said that he wanted to order something. She was standing behind the cash register when he pulled out a gun from underneath his coat and told her to give him all of the money in the cash register. She said that she was frightened. She testified that he told Mr. Tiscia not to look at him, but she said that she looked at him and that he did not have on a mask or anything covering his face. She gave him all of the money in the register. Ms. Wilson said that the defendant asked Mr. Tiscia for his watch and ring. She testified that the defendant told them both that he was going to take them to the back of the restaurant. She said that she started walking down the hallway but went into a storage room and locked the door behind her. The back door of the restaurant was in the storage room, and she left the restaurant to call the police from the Family Dollar Store nearby. When she left the Family Dollar Store, she saw the defendant running across a parking lot. Ms. Wilson said that he was screaming at her that she "better go back in or something." She testified that the police showed her a photographic lineup five days later, and she identified the defendant as the person who robbed her.

On cross-examination, Ms. Wilson recalled that the police showed her a single photograph of the defendant prior to showing her his photograph in the photographic lineup. She also recalled that the defendant had a lazy eye. She could not remember what the gun looked like, nor did she remember telling the police that it was a shotgun.

---

[1] Mr. Tiscia referred to himself as Michael in his trial testimony. The indictment lists his name as Matthew Tiscia.

Michael Tiscia testified that he had been a regular customer at the CK's Coffee Shop on Summer Avenue for thirty to thirty-five years. Mr. Tiscia testified that on April 17, 2000, he was having a cup of coffee in the restaurant when a man came inside with "like a rain coat kind of gear on." The man started to order food but then said that "this [was] a robbery." Mr. Tiscia said that the man pulled a gun from underneath his coat and ordered Ms. Wilson to give him the money from the cash register. The man told Mr. Tiscia to stop looking at him, so he faced forward and tried to look at the man from the corner of his eye. Mr. Tiscia said that the man told him to give him his ring, so he gave the man his ring and his watch. He testified that his watch was worth $9 or $10 but that his ring was worth $2,600. He said that the ring was "especially made" for him. Mr. Tiscia testified that the man pointed the gun at him too, and when the gun was pointed at him, Mr. Tiscia felt "real [s]haky." He said that the man asked them to go to the back room. Ms. Wilson went first, and Mr. Tiscia followed her. The man walked behind them with his gun on both of them. Mr. Tiscia said that Ms. Wilson went into the back room and locked the door. The man told him to get into the bathroom, so he complied and locked the door. He did not leave the back room until Ms. Wilson came inside the restaurant and yelled for him. The police arrived soon thereafter. Mr. Tiscia said that he described the robber to police, noting that the robber "had like a slow eye, kind of a weak eye" and was a "[p]retty nice size guy." Mr. Tiscia said that when the police showed him a photographic lineup, he could not originally decide between the second and the sixth photographs, so the police indicated that he could not make a positive identification. He testified that he believed the robber was the person in the second photograph because he "remember[ed] the kind of slow eye[,] . . . kind of half closed all the time." Mr. Tiscia said that he did not get his ring back.

Memphis Police Officer James Howard testified that he responded to an armed robbery call at the CK's Coffee Shop on Summer Avenue on April 17, 2000. He spoke with the victims, took a report, and put out a broadcast of the suspect's description. Officer Howard said that the suspect had on a dark coat and was armed with a sawed-off shotgun. He also broadcast the description of a vehicle, a gray Chrysler from the mid-1980s, that might have been associated with the robbery.

On cross-examination, Officer Howard read the suspect information portion of his report: "Male black. [Twenty-eight] to [thirty] years of age. Six foot. Hundred and seventy-five pounds. Brown eyes. Black hair. Medium build. Short hair. Medium complexion. Clean shaven. Wearing a checkered overcoat[,] green and gray. Black pants and brown shoes."

Memphis Police Major Jeff Clark testified that he first encountered the defendant in the Robbery Bureau offices on April 18, 2000, but did not speak to him that day. He interviewed the defendant on April 20, 2000, after the defendant signed an advice of rights

form. He asked the defendant whether he was involved with the robbery of a different CK's Coffee Shop, located on Poplar Avenue, and the defendant confessed to being "the lone gunman in the robbery of a CK's near Highland." Major Clark said that he knew immediately that the defendant was telling him about a different robbery than the one about which he had asked. The defendant said that a man named Jimmy Maze drove him to the restaurant in a Chrysler New Yorker. The defendant told Major Clark that there was a black female employee and a white male customer in the store. The defendant said that he pulled out a gun, demanded money from the cash register, took the money, and also took a ring and watch from the customer. The defendant told Major Clark that he left the restaurant on foot and returned to Jimmy Maze's Chrysler. The defendant reported that he kept $100 of the robbery proceeds and gave the remainder to Jimmy Maze. The defendant told Major Clark that he committed the robbery because he "'wanted some crack and didn't have no money to buy any.'" Major Clark testified that the defendant said he used Jimmy Maze's long barrel .22 caliber pistol in the robbery and described the firearm in depth. Major Clark testified that he was familiar with that type of weapon from his personal experience, and he said that some people would call it a rifle and others would call it a pistol.

Following the close of proof and deliberations, the jury convicted the defendant as charged. The trial court merged the two convictions in case number 01-00913 and the two convictions in 01-00914. The trial court sentenced the defendant as a Range II, multiple offender to serve twenty years in case number 01-00913 concurrently with twenty years in case number 01-00914 in the Tennessee Department of Correction. The court ordered the defendant to serve his sentences consecutively to his sentence in case number 01-00926.

### Hearing on Motion to Dismiss Indictments

On October 17, 2008, the trial court held a hearing on the defendant's motion to dismiss the indictments based on a violation of the right to a speedy trial. The State called the Shelby County District Attorney General to testify. She was assigned to Division Five, where the defendant's cases were handled, and she was familiar with the prosecution as it occurred. She testified that the defendant first appeared in Division Five in February 2002. The court arraigned him in March 2002 and appointed Attorney Michael Scholl to represent him. The trial court set a trial date for November 5, 2002. Prior to that date, the State was to inform Attorney Scholl which of the defendant's eighteen indictments it would prosecute first. The District Attorney General testified that Attorney Scholl requested a mental evaluation and transcripts from a collateral matter tried in Division Ten. She said that Attorney Scholl requested continuances in order to obtain the Division Ten transcripts, and she testified that the State never requested a continuance.

The District Attorney General testified that by May 22, 2003, Attorney Trey Jordan had been appointed in Attorney Scholl's place. The defendant went to trial on May 27, 2003, and the trial concluded on May 29, 2003. The jury convicted the defendant of aggravated robbery. She testified that after the verdict, the defendant assaulted Attorney Jordan while in the Division Five lockup. The trial court allowed Attorney Jordan to withdraw and ruled that the defendant had forfeited his right to an appointed attorney. The trial court sentenced the defendant on July 23, 2003, and set the defendant's next trial for April 2004. She said that the defendant pursued an appeal about the trial court's ruling that the defendant was to proceed pro se.

She testified that a hearing on a suppression motion was set for March 19, 2004, but the court reset it to April 19, 2004, because Major Jeff Clark was unavailable to testify on March 19. She said that the trial court was unable to hear the motion on April 19 because the judge was not available. She testified that she had a trial beginning the next week, so the hearing was reset to November 1, 2004. She testified that "the countless continuances" began at that point. She said that Attorney Jake Werner, who had either been appointed or had signed on to represent the defendant in his appellate matters,

> would come in and advise Judge Dailey that basically they didn't want to do anything on these other cases until [they] knew what the Court of Appeals was going to do with the issue of whether or not [the defendant] should be given counsel or be made to proceed pro se after having hit [Attorney] Jordan.

She said that in 2006, the appellate court remanded the matter for factual hearings.

She testified that in October 2006, the court appointed Attorney Copeland to represent the defendant because Attorney Werner was leaving private practice. On January 9, 2007, Attorney Copeland requested a mental evaluation of the defendant. She testified that by February 2007, Judge Dailey had retired, and the Division Five docket had been sent to Division Seven, where Judge Coffee presided. Because Judge Coffee had been a prosecutor, the defendant was asked to waive any perceived conflict, but the defendant refused to waive conflict. The criminal court clerk assigned the matter to Division Six. The defendant first appeared in Division Six on March 8, 2007, and the court appointed Attorney Copeland to represent the defendant in all of his other cases. The defendant was tried in Division Six in 2008. She testified that the State never requested a continuance, and the only time that the State's calendar was involved in the resetting of a court appearance was the motion hearing which was reset from April to November 2004, partially due to the court's schedule and partially because of the State's.

In response to questioning by the court, she testified that she was unaware of the exact arrangement between Attorney Werner and the defendant. She said,

> The impression the State was given each time this case was on the docket was that either Mr. Werner or the defendant through Mr. Werner didn't want to address the outstanding trial matters. They wanted to resolve the issue in the Court of Appeals first[, a]nd that kind of took precedent over everything else that [the defendant] had pending. . . . [W]e were kind of left waiting for other people to tell us what to do next.

The defendant testified that he retained Attorney Werner to represent him on appeal, and he had no communications with him about trial matters. He said that he never asked anyone to request continuances. The defendant testified that no attorney represented him regarding trial matters from the time that Judge Dailey ruled that he forfeited his right to an appointed attorney until the court appointed Attorney Copeland. He testified that he filed a pro se motion to dismiss for failure to prosecute on September 22, 2006. No one asked him whether he wanted to set a date to hear the motion. The defendant said that he asked Judge Coffee in Division Seven about the motion on the same day that Judge Coffee appointed Attorney Copeland. He agreed that the State gave testimony regarding the motion that day. He further agreed that he asked for his case to be reassigned to another court that day.

The defendant testified that he was arrested in April 2000 but released on a motion for speedy trial. The grand jury indicted him on January 31, 2001. He said that he lived in the same place from the time that he was released in 2000 until he was arrested again.

On cross-examination, the defendant testified that he filed a pro se motion for a speedy trial in December 2002. He said that he filed multiple speedy trial motions. The defendant said that he never asked for a hearing on the motions or for a trial date because the court "never called [him] down."

On redirect examination, the defendant testified that he was incarcerated at the Whiteville Correctional Facility during the period from 2002 until 2006 when he was proceeding pro se.

The court issued a written order denying the defendant's motion to dismiss on February 11, 2009. After considering the testimony presented at the hearing and documentary evidence, the trial court applied the factors from *Barker v. Wingo*, 407 U.S. 514 (1972), to the facts of this case. The trial court found that the defendant had asserted his right to a speedy trial in 2002 and 2006; the grand jury returned the indictments against the defendant in January 2001, and his attorney filed the motion to dismiss *sub judice* in April

-6-

2008; the State was not responsible for the delay; and the defendant had not demonstrated actual prejudice. The trial court concluded that the *Barker* factors weighed against the defendant and denied the defendant's motion to dismiss the indictments.

## ANALYSIS

### I. Speedy Trial

The defendant contends that the trial court abused its discretion in denying his motion to dismiss based on a violation of the right to a speedy trial. Specifically, he argues that the delays were caused by bureaucratic indifference or negligence because it was unreasonable to allow Attorney Werner to request continuances when he only represented the defendant on appeal. Furthermore, the defendant argues that the trial court should have presumed prejudice in this case based on *Doggett v. United States*, 505 U.S. 647 (1992). The defendant specifies that he complains about the delay between the return of the indictments and his arrest and between his first trial and the trial presently under review.

Both the United States and Tennessee Constitutions guarantee criminal defendants the right to a speedy trial. U.S. Const. amend VI; Tenn. Const. art. I, § 9; *State v. Utley*, 956 S.W.2d 489, 492 (Tenn. 1997). A right to a speedy trial is also statutory in Tennessee. *See* Tenn. Code Ann. § 40-14-101. The Tennessee Rules of Criminal Procedure provide for the dismissal of an indictment if there exists unnecessary delay in bringing a defendant to trial. Tenn. R. Crim. P. 48(b). The Tennessee Supreme Court employs the balancing test that the United States Supreme Court established in *Barker* to determine whether a speedy trial violation has occurred. *See State v. Simmons*, 54 S.W.3d 755, 759 (Tenn. 2001). The *Barker* test weighs (1) the length of delay, (2) the reasons for the delay, (3) the accused's assertion of the right to a speedy trial, and (4) the prejudice resulting from the delay. *Barker*, 407 U.S. at 530-32. If a court determines, after applying the *Barker* balancing test, that a defendant has been denied a speedy trial, the remedy is dismissal of the indictment. *Id.* at 522. This court reviews the trial court's determination regarding whether the defendant's right to a speedy trial was violated for an abuse of discretion. *State v. Hudgins*, 188 S.W.3d 663, 667 (Tenn. Crim. App. 2005) (citing *State v. Jefferson*, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996)).

We first consider the length of the delay. Generally, post-accusation delay must approach one year to trigger a speedy trial inquiry. *See Doggett* 505 U.S. at 652, n. 1; *Utley*, 956 S.W.2d at 494. The reasonableness of a delay depends upon the complexity and nature of the case. *Doggett*, 505 U.S. at 652; *Utley*, 956 S.W.2d at 494. In this case, the grand jury returned eighteen indictments on January 31, 2001, and the authorities arrested the defendant on February 2, 2002. There is no evidence in the record regarding the delay between the

returning of the indictments and the arrest of the defendant in 2002, other than the defendant's assertion that he was living at home the entire time. His first trial was in May 2003, and after the guilty verdict was returned, the defendant assaulted Attorney Jordan. The trial court ruled that the defendant forfeited his right to a court appointed attorney, and the defendant appealed that decision, represented by Attorney Werner. This court remanded the case for a hearing on November 15, 2006. According to the trial court's findings of fact, Attorney Copeland was first appointed on November 30, 2006, after which time the remaining cases proceeded toward disposition. Clearly, there was a delay of longer than one year between the returning of the indictments and the appointment of Attorney Copeland, triggering further inquiry.

Next, we consider the reason for delay. This factor generally falls into one of four categories: (1) intentional delay to gain a tactical advantage over the defense or to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. *State v. Wood*, 924 S.W.2d 342, 346-47 (Tenn. 1996). The trial court found that the delays were not attributable to the State but to the defendant's assault on his attorney and subsequent appeal of the first trial court's determination that he had forfeited his right to appointed counsel. The trial court further found that the State and the court acted reasonably in waiting for the appellate decision. The District Attorney General testified that Attorney Werner repeatedly asked for continuances to wait for that decision. She also testified that she did not know the exact representation arrangement between Attorney Werner and the defendant. The fact that the delay was triggered by the defendant's actions weighs against him.

The third factor to consider when conducting a *Barker* test is whether the defendant asserted his right to a speedy trial. *Barker*, 407 U.S. at 531-32. Assertion of the right strongly weighs in favor of the defendant, while failure to assert the right ordinarily will make it difficult to prove that the right has been denied. *Id.* The trial court found that the defendant filed a motion for speedy trial on the cases *sub judice* on September 26, 2006. Through his attorney, he filed a motion to dismiss the indictments due to a speedy trial violation on April 14, 2008. This factor weighs in the defendant's favor.

The final and most important factor in the Barker analysis is whether the accused has suffered prejudice from the delay. *Barker*, 407 U.S. at 532. When evaluating this factor, courts must be aware that the right to a speedy trial is designed (1) to prevent undue and oppressive incarceration prior to trial, (2) to minimize anxiety and concern accompanying public accusation, and (3) to limit the possibilities that long delay will impair the defense. *State v. Bishop*, 493 S.W.2d 81, 85 (1973); *see Smith v. Hooey*, 393 U.S. 374, 378 (1969). Here, the defendant was incarcerated on his twenty-year sentence from his first trial, so the first two considerations are not applicable here. As for the impairment of his defense, the

defendant did not present any evidence and relied on his attorney's argument that the attorney could not develop an alibi defense. While witnesses' memories, including the defendant's memories, may fade overtime, we note that Major Clark interviewed the defendant within days of the CK Coffee Shop robbery, and the defendant clearly remembered that he was the person responsible for that robbery at the time. The defendant's argument that prejudice should be presumed in this case relies on this court finding that the State caused the delays. Because the defendant was responsible for the delays and did not make any showing of prejudice at all, we conclude that this factor does not weigh in favor of the defendant.

After applying the *Barker* balancing test, we conclude that the trial court did not abuse its discretion in denying the defendant's motion to dismiss due to a speedy trial violation. Therefore, the defendant is without relief as to this issue.

## II. Jury Selection

For his second issue, the defendant argues that the trial court erred by not striking the entire jury panel after one prospective juror stated that the defendant was "freaking [her] out." He contends that the prospective juror's "bizarre reaction could not have aided Defendant in his attempt to have a fair trial." The record shows that while the State was questioning the jury panel during the selection process, the juror said, "[T]hat guy is really freaking me out." The record reflects that the juror was crying, as well. The defendant's attorney requested a bench conference and asked that the court strike the entire jury panel. The trial court agreed to excuse the juror and allowed the parties to voir dire the remainder of the jury panel about whether the juror's reaction influenced them. The defendant did not challenge any of the prospective jurors based on their responses to questioning the juror's outburst.

The procedure for selecting a fair and impartial jury is left to the sound discretion of the trial court. *State v. Bowers*, 77 S.W.3d 776, 783 (Tenn. Crim. App. 2001). This court will not overturn a trial court's decision on the qualifications of jurors absent an abuse of discretion. *Id.*

The defendant cites numerous cases in his brief where courts in this state ruled that improper comments by prospective jurors did not taint the jury panel. In *State v. Harries*, 657 S.W.2d 414 (Tenn. 1983), a prospective juror stated that she heard on the radio about defendant's drug use. *Harries*, 657 S.W.2d at 419. The supreme court ruled that the defendant was not denied a fair trial because the prospective juror was excused, the remaining jurors indicated that they could and would ignore the prospective juror's statements, and the information presented by the prospective juror was brought out during trial by the defendant. This court concluded in *Cooper* that a prospective juror's statements

about his views on drugs and drug dealers, which did not comment on the defendant's guilt or innocence, did not taint the jury venire or deny the defendant a fair trial because "'in the absence of proof to the contrary'" the jury is considered "'impartial and qualified.'" *State v. Cooper*, 736 S.W.2d 125, 130 (Tenn. Crim. App. 1987) (quoting *Graves v. State*, 489 S.W.2d 74, 81 (Tenn. Crim. App. 1972)). In *McGregor*, the defendant argued that comments by a prospective juror "that he heard [the] defendant had been in prior trouble" tainted the entire jury venire. *McGregor v. State*, 491 S.W.2d 619, 623 (Tenn. Crim. App. 1972). This court ruled that "the trial court, who [has] wide discretion in the selection of juries, was justified in being satisfied that the jury would and did follow his admonitions" to "try the defendant upon the facts and evidence alone." *Id.* The *McGregor* court also stated, "We are satisfied from our many years of trial experience that prospective jurors sometimes inadvertently blurt out answers which surprise and contort the respective attorneys." *Id.* In contrast to those cases, the Tennessee Supreme Court in *State v. Scruggs* granted Scruggs a new trial because a prospective juror's statement that he had been Scruggs's probation officer prejudiced the defendant because the jury sentenced him to two-and-a-half times the minimum sentence, possibly because of the information offered by the prospective juror. *State v. Scruggs*, 589 S.W.2d 899, 901 (Tenn. 1979).

In this case, the prospective juror did not offer any information about the defendant; she merely reacted emotionally to his presence. The remaining prospective jurors indicated that they were not influenced in any way by her outburst. The defendant has offered no proof of prejudice beyond conjecture that he "maintains the outburst had to have caused the jury to have negative feelings toward Defendant." With no proof to the contrary, we conclude that the trial court did not abuse its discretion during the jury selection process. This issue is without merit.

### III. Denial of Motion for Mistrial

For his final assignment of error, the defendant contends that the trial court erred by denying the defendant's motion for mistrial when the jury indicated after approximately five hours of deliberation that it could not reach a unanimous decision. The record reflects that the trial court asked the jury to continue deliberations, without further inquiry or giving additional instructions.

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. *See id.*; *State v. Jones*, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a

criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting *Arnold*, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. *Land*, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. *Id.*

Under *Kersey v. State*, when the jury advises the trial court that it is deadlocked, the trial court may give supplemental instructions if it "feels that further deliberations might be productive." 525 S.W.2d 139, at 141 (Tenn. 1975). In order to avoid intruding on the province of the jury by "coercing the minority to yield to the majority," when instructing the jury to continue deliberations, the trial court should not "direct any of its comments to jurors in the minority" or "urge such jurors to reevaluate or to cede his or her views to those of the majority." *State v. Baxter*, 938 S.W.2d 697, 704 (Tenn. Crim. App. 1996). *Kersey* advises trial courts that they may re-read the portion of the jury charge that explains that the verdict should be unanimous while warning the jurors against "surrender[ing] [their] honest conviction . . . because of the opinion of [their] fellow jurors." *Kersey*, 525 S.W.2d at 145. However, the court is not required to repeat the *Kersey* charge. *See id.* Additionally, when a court chooses to repeat instructions or give supplemental instructions, the instructions must be:

> (1) appropriately indicated by questions or statements from jurors, or from the circumstances surrounding the deliberative and decisional process, (2) comprehensively fair to all parties, and (3) not unduly emphatic upon certain portions of the law to the exclusion of other parts equally applicable to the area of jury misunderstanding or confusion.

*Berry v. Conover*, 673 S.W.2d 541, 545 (Tenn. Ct. App. 1984).

While the court might have repeated the *Kersey* instructions, the court was not required to do so. *Kersey*, 525 S.W.2d at 145. The court's instruction to the jury to continue deliberations was not coercive. *Baxter*, 938 S.W.2d at 704. Furthermore, by not repeating any part of the instructions, the court avoided emphasizing portions of the law. *Berry*, 673 S.W.2d at 545. Therefore, we conclude that the court's denial of the defendant's motion for mistrial and instruction to the jury to continue deliberations was appropriate. The defendant's argument is without merit.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE