IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

APRIL 1996 SESSION

**FILED**

**January 22, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 02C01-9506-CC-00169 |
| | ) | |
| | ) | Dyer County |
| v. | ) | |
| | ) | Honorable Joe G. Riley, Judge |
| | ) | |
| WILLIAM PAUL BOGUS, | ) | (First Degree Murder in the Perpetration |
| | ) | of a Felony and Aggravated Burglary) |
| Appellant. | ) | |

For the Appellant:

Lyman Ingram
P.O. Box 742
Dyersburg, TN 38024
(AT TRIAL)

G. Stephen Davis
District Public Defender
P.O. Box 742
Dyersburg, TN 38025-0742
(ON APPEAL)

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
        and
Michelle L. Lehmann
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

C. Phillip Bivens
District Attorney General
        and
James E. Lanier
Assistant District Attorney General
Dyer County Courthouse
Dyersburg, TN 38024

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

# O P I N I O N

The defendant, William Paul Bogus, appeals as of right from his convictions for first degree murder in the perpetration of a felony and aggravated burglary, a Class C felony, that he received in separate jury trials in the Circuit Court for Dyer County.[1] The defendant received a sentence of life without the possibility of parole for the murder and a Range II sentence of nine years on the aggravated burglary conviction. Relative to the first degree murder in the perpetration of a felony, the defendant contends that (1) the evidence is insufficient to support his conviction for felony murder, (2) the trial court erred in refusing to grant a mistrial when a juror saw the defendant being transported to the courthouse in a Department of Correction vehicle, and (3) the jury abused its discretion in sentencing the defendant to life without the possibility of parole. As for the aggravated burglary case, the defendant contends that (1) the evidence is insufficient to prove that he had the intent needed for burglary and (2) the nine-year sentence imposed by the trial court is excessive. We disagree with the defendant's contentions in both cases.

## I.  FIRST DEGREE MURDER IN THE PERPETRATION OF A FELONY

The defendant was charged with the first degree murder of his wife, Debra Johnson Bogus. Nicole Moses, the victim's work supervisor, testified that she had worked with the victim on November 17, 1993, the evening before the murder. She stated that she watched the victim count out thirty-one one-dollar bills in tips, and she identified a Shoney's tip receipt for thirty-one dollars. She testified that she took the victim home at approximately 1:30 a.m. and that it appeared that someone had opened the trailer door from the inside. She testified that to her knowledge, the victim had not

---

[1] These separate cases were never consolidated and separate notices of appeal were filed. However, the record on appeal prepared below improperly commingles the pleadings, court papers and orders, and transcripts involving both cases so as to reflect a single appeal. A separate record on appeal should have been prepared for each unconsolidated case being appealed. Then, if a common question of law or common facts are involved, consolidation of the cases on appeal may be ordered by us upon our own or a party's motion. T.R.A.P. 16(b).

been called into work the next morning but was scheduled to work the next day at 5:00 p.m. On cross-examination, Ms. Moses stated that she and the victim stopped at the Short Stop Market and that the victim purchased beer, cigarettes, and a cigarette lighter.

Lisa Haymon, sister of the defendant, testified that on the night before the victim was killed, the defendant came to her home and asked for money because he needed a place to stay. He told her that he and his wife, the victim, had been fighting. Ms. Haymon stated that she did not give the defendant money because she had learned that he was on drugs. The next morning, the defendant called her and asked if anyone had been looking for him. She stated that the defendant talked "crazy" in that he wanted her to contact the Veteran's Administration in order to plan his funeral arrangements.

Joseph Lee, an acquaintance of the defendant, testified that about 11:00 p.m. on the night before the murder, the defendant came to his home and told him that he had no money but that someone he worked with had cash and wanted to buy drugs. Mr. Lee stated that he gave the defendant one rock of cocaine so that the potential buyer could sample the drugs. At approximately 12:00 p.m., the defendant returned with fifty dollars in tens and twenties, and Mr. Lee gave him three rocks. Mr. Lee saw the defendant again at approximately 3:00 a.m. when the defendant returned with one five-dollar-bill and twenty one-dollar-bills. At that time Mr. Lee sold the defendant more cocaine. The defendant returned a fourth time with more money, but Mr. Lee had no more drugs.

Mr. Lee admitted that he had been told that he would not be prosecuted on any charges in relation to his testimony. When asked if he was still dealing drugs, Mr. Lee replied, "No, sir." When questioned as to whether he would tell the court if he

3

was dealing, he replied, "No, sir." On cross-examination, Mr. Lee admitted that he gave the defendant an "advertisement rock" when he came to his home at 11:00 p.m. so that the defendant could sell Mr. Lee's drugs to someone else. He also admitted that he sold drugs to other people on the night of the murder.

John Connell, the defendant's stepson, testified that he was attending Dyer County Central School at the time of his mother's death and that on the morning following the murder, the defendant awakened him and told him to get ready for school. The defendant would not let him enter his mother's room and told him that his mother had been called in early to go to work. He stated that the defendant then walked with him to school.

On cross-examination, Mr. Connell admitted that the defendant told him that he was going to Jr. Food Mart to get cigarettes on the morning in question and that the school was located directly on the way to the store. He also admitted that he had never seen the defendant strike his mother.

Dr. O'Brien Clary Smith, a specialist in forensic pathology, testified that he examined the body of the victim at 8:00 a.m. on November 19, 1993, and concluded that the victim had died as a result of strangulation in which compressive or "squeezing" forces had been applied across the neck area. He also concluded that forces causing the injuries could have come from a human hand. He stated that the strangulation would have lasted at least two to four minutes before the victim lost consciousness.

Dontia Owens, another acquaintance of the defendant, testified that she and another friend gave the defendant a ride from the east side of town to the west side on November 18 at approximately 3:00 or 4:00 a.m. The defendant told the two women that they were nice and should not "get on crack." Later, Ms. Owens saw the defendant

4

again and gave him a return ride to his home. The defendant told the women that he had been smoking crack all night and that if he got "geeked up enough," he would probably rob a store. He also told them that he hoped his wife would not be waiting up for him. He asked the women if they would like to buy a deep freezer for three hundred or four hundred dollars or if they knew anyone who would like to buy such a freezer.

Kim Kimmons, the friend with Ms. Owens, testified that the defendant told the women that he had slipped out while his wife was asleep because she did not know that he used drugs. She stated that at the time he got in the car, he had some change and some one-dollar-bills in his hand. On cross-examination, she stated that she told the officers about the one-dollar-bills in her statement made the day after the murder but that part of the statement had apparently not been recorded.

Quinton Miles, the boyfriend of a neighbor of the victim, testified that he pulled into the victim's driveway at approximately 4:00 a.m. on the morning of the murder and saw the defendant standing across the street. The defendant asked him if he would like to buy a television, and Mr. Miles replied, "No." The defendant showed Mr. Miles the television that was inside the victim's trailer anyway, and Mr. Miles then moved his car. Don McElrath, a neighbor of the defendant and victim, testified that the defendant came to his home at 6:00 a.m. on the day of the murder and attempted to sell him a freezer for fifty dollars.

Larry Henning, an acquaintance of the defendant, testified that he was at the home of Luther Ingram between 4:00 and 6:00 a.m. on the morning of the murder and that the defendant was present. He stated that he and his girlfriend, Freida Jones, noticed a blood spot on the defendant's shirt and that Ms. Johnson had questioned the defendant about the spot and the scratches on his neck. The defendant told them that the scratches were old. On cross-examination, Mr. Henning admitted that he received

5

ten or fifteen dollars from Officer Jim Porter after he made a statement to the police, but he denied that the money was paid in exchange for his statement. Ms. Johnson testified, corroborating Mr. Henning's testimony. Ms. Johnson admitted on cross-examination that she was presently incarcerated on probation revocation charges and that she and Mr. Henning had joined the defendant in smoking crack cocaine at Mr. Ingram's house.

Officer Jim Porter, an investigator with the Dyersburg Police Department, testified that he participated in the investigation of the victim's murder and that he was present when the victim's body was found wedged in a cavity in the bedroom closet of her trailer. He stated that a tip receipt was found on a nightstand in the bedroom. Pictures of the victim as she was found in the closet were introduced into evidence.

Officer Porter testified that the defendant was arrested at a different location, and when he was questioned about another incident of which he was accused, Officer Porter told him that he had reason to believe that the defendant had killed his wife. The defendant answered that he "couldn't hurt that girl," but he never asked how his wife had been killed or where her body had been found. Pictures of the defendant's wounds as they appeared when he was arrested were introduced into evidence. The defendant gave no explanation as to how he had received puncture wounds and scratches that appeared to have come from fingernails. On cross-examination Officer Porter admitted that he gave Larry Henning ten dollars in order for Mr. Henning to assist him in contacting Mr. Henning's girlfriend.

Joey McDowell, another investigator with the Dyersburg Police Department, testified that he also assisted in the investigation of the victim's murder and that the defendant had told him that he left home at approximately 10:00 p.m. on the evening before the murder and did not return until 7:00 a.m. the next morning. Stan

6

Cavness, an officer with the Dyersburg Police Department, testified that he was asked to locate the victim's son and at that time the defendant became a suspect. When Officer Cavness questioned the defendant concerning the defendant's wounds and scratches, the defendant told him to ask the defendant's sister about them because he had told her the night before the murder that he and his wife had been fighting. When asked if it was his wife's money he used to buy crack at 3:00 a.m. on November 18, the defendant stated that he would not have to take money from his wife because she would give it to him. When asked if it would be possible if he had used twenty to twenty-five rocks of crack cocaine that he would do something crazy like kill his wife, the defendant responded that he would not kill her on purpose.

Larry Bell, captain with the Dyersburg Police Department, testified that he found the body of the victim behind the left door of a closet in a bedroom of the trailer of the victim and the defendant. Her body was semi-covered with bed clothing. Lois Montgomery, an investigator with the Dyersburg Police Department, testified that she took the pictures of the defendant and taped the defendant's second interview. The tape of the interview was played for the jury, and the state rested its case.

James Collins, acquaintance of the defendant, testified for the defense that he heard screaming in his mother's home on the morning of November 18 and entered the kitchen to find the defendant scuffling with Mary Ward. He stated that he scuffled with the defendant in an area where glass had been broken. On cross-examination, however, Mr. Collins stated that no blood had been found in the house after the incident. The defendant chose not to testify. Closing arguments were heard, the jury was instructed, and the defendant was found guilty of first degree murder in the perpetration of a robbery.

## A. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to sustain his conviction for first degree murder in the perpetration of a felony because the evidence is entirely circumstantial and that no hard evidence actually links him to the crime. The state contends that the evidence sufficiently shows that the defendant killed his wife in the process of forcibly taking her money. We agree.

When the sufficiency of the evidence is questioned on appeal, our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we resolve all conflicts in the testimony and draw all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978).

At the time of the killing, the felony murder form of first degree murder was defined as the unlawful "reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy." T.C.A. §§ 39-13-201(a) and -202(a)(2) (1991).[2] A person "acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." T.C.A. § 39-111-302(c). The defendant was charged with recklessly killing his wife during the perpetration of a robbery.

---

[2] We note that the provision defining felony murder was amended in 1995 to delete the reckless mens rea element. <u>See</u> T.C.A. § 39-13-202(b).

The proof viewed in the light most favorable to the state establishes that the defendant had been attempting to obtain drugs on the night of the murder. He had asked his sister for money and had obtained a rock of cocaine from his dealer. The victim had received thirty-one dollars in tips that evening, and she had placed the roll of one-dollar bills in her apron. She spent some of the money at a local store purchasing beer, cigarettes, and a lighter. Someone let the victim into her trailer at approximately 1:30 a.m. At about 3:00 a.m., witnesses saw the defendant with a stack of one-dollar bills. Somewhere between 3:00 a.m. and 5:00 a.m., other witnesses saw the defendant with fresh scratches and blood spots on his shirt.

The victim's body was found on the morning of November 18. The tip money in one-dollar bills was missing. The autopsy showed that the victim had been strangled, and the marks on the victim were consistent with the theory that she had been strangled by human hands. On the morning following the murder, the defendant would not allow his stepson to enter the victim's room and falsely told him that his mother had been called into work.

When police arrested the defendant on another charge, they noticed that he had fresh scratches and fingernail marks on his person. When they questioned him concerning the murder of his wife, he denied involvement, but he did not ask about the circumstances of her death. When questioned further, he stated that he would not kill his wife "on purpose." Under these circumstances, a rational trier of fact could have determined beyond a reasonable doubt that the defendant intended to rob the victim and that the killing occurred during the robbery of the victim. See Mullendore v. State, 183 Tenn. 53, 63, 191 S.W.2d 149, 152 (1945) (evidence that the defendant took the victim's money and appropriated it to his own use permitted the jury to infer that the defendant intended to rob the victim, although no prior intent to rob was otherwise

shown). We hold that the proof is sufficient to establish beyond a reasonable doubt the defendant's guilt for felony murder.

## B. JURY PREJUDICE

The defendant asserts that his right to a fair trial was denied when one of the jurors saw him being transported to the courthouse in a vehicle from Northwest Correctional Facility on the second day of the trial. The defendant relies upon this court's decision in Willocks v. State, 546 S.W.2d 819 (Tenn. Crim. App. 1976), for the proposition that the court should have given adequate instruction to the jury that the restraint of a defendant should in no way affect their determination of guilt of lack thereof when jurors are exposed to a defendant's custodial status. The defendant argues that the trial court's failure to give an adequate instruction constitutes prejudice to the judicial process and thus requires a reversal. The state counters that the defendant was not inherently prejudiced because none of the jurors saw him in shackles. It argues that the defendant's claim must fail because he has presented no evidence of actual prejudice.

On the morning of October 5, 1994, as the sequestered jurors were walking to the courthouse, the defendant arrived at the courthouse in a transport car belonging to Northwest Correctional Facility. A sheriff's officer immediately went to the vehicle and told the driver to circle the block because the jury had just arrived.

The incident was brought to the trial court's attention, and the court individually voir dired each of the jurors. All jurors save one told the court that they had not seen the defendant in the car on the morning in question. Juror Phillip Toles, however, testified that he had seen the defendant in the backseat of a "state car," and that he knew the car because he occasionally preached at the correctional facility. Mr. Toles recalled that the car had a caged backseat. He stated that when he first saw the

10

defendant in the car, one of the sheriff's officers stopped him and another asked the car carrying the defendant to leave. He admitted that later that morning he told other jurors that he thought the defendant was present because the jurors were wondering how soon the trial would start that day. He also admitted that he had told other jurors that he thought the defendant was being held at Northwest Correctional Facility because he had seen one of the guards' badges. The defendant moved for a mistrial, and the trial court denied the motion, concluding that the fact that one juror saw the defendant in a state car and concluded that he was possibly being held at a state facility was not sufficient grounds for a mistrial.

The defendant contends that his due process rights were violated when the juror saw him restrained in a car belonging to the Department of Correction. In Willocks, this court recognized that the presumption of innocence, which is mandated by due process, includes the right to the physical indicia of innocence. This court reversed Willocks's convictions because his mandatory appearance in shackles at trial violated his due process rights when less drastic security measures could have been used.

In Estelle v. Williams, 425 U.S. 501, 512, 96 S. Ct. 1691, 1697 (1976), the Supreme Court recognized that it is a violation of due process for a state to compel a defendant to stand trial before a jury in prison clothes. The Court reasoned that prison clothing worn at trial is a constant reminder of the defendant's condition and presents an unacceptable risk of influencing a juror's judgment. Id. at 504-05, 96 S. Ct. at 1693. However, the Court concluded that the defendant's due process rights were not violated in Estelle because he was not compelled to wear prison garb.

Unlike a case in which a defendant is unjustifiably shackled or forced to wear prison garb during his trial, the jury's improper exposure to the defendant in this

11

case was minimal. A sole juror briefly saw the defendant while the defendant was in the backseat of a state car. Under these circumstances, we do not believe that the state's practice of transporting the defendant in a state car was inherently prejudicial.

If a challenged practice is not inherently prejudicial and the defendant fails to show actual prejudice, then his complaint must fail. Holbrook v. Flynn, 475 U.S. 560, 106 S. Ct. 1340, 1347-48 (1986); Carroll v. State, 532 S.W.2d 934, 936 (Tenn. Crim. App. 1975). Because the defendant in this case has failed to demonstrate actual prejudice, he is not entitled to relief.

## C. LIFE WITHOUT PAROLE

The defendant asserts that the sentence of life without the possibility of parole imposed by the jury was excessive under the sentencing considerations set forth in T.C.A. §§ 39-13-204 and -207.[3] The defendant contends that the jury abused its discretion by failing to weigh and consider any mitigating circumstances. The state argues that the evidence tending to support the mitigating circumstances was not as overwhelming as the defendant claims, and accordingly, the jury did not abuse its discretion. We agree.

When the state does not seek the death penalty but is seeking imprisonment for life without possibility of parole and the jury finds the defendant guilty of first degree murder, a separate sentencing proceeding must be had in which the jury determines the punishment. T.C.A. § 39-13-207(a). If the jury determines that the state has proven beyond a reasonable doubt at least one statutory aggravating circumstance, it must fix the punishment as either imprisonment for life without possibility of parole or imprisonment for life. T.C.A. § 39-13-207(c). The jury must be

---

[3] Effective July 1, 1993, the punishments available for first degree murder are (1) death; (2) imprisonment for life without possibility of parole; or (3) imprisonment for life. See T.C.A. § 39-13-202(c). Before this enactment, the only available punishments were death and life with parole.

instructed that it must weigh and consider any statutory aggravating circumstances and any mitigating circumstances.

In reviewing the sentence on appeal, pursuant to T.C.A. § 39-13-207(g), this court must use the following standard of review:

> When a defendant has been sentenced to imprisonment for life without possibility of parole, such defendant may appeal such sentence to the Tennessee court of criminal appeals. The court of criminal appeals shall first consider any errors assigned and then the court shall review the appropriateness of the sentence. A sentence of imprisonment for life without possibility of parole shall be considered appropriate if the state proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion.

In our view, the sentence of life without possibility of parole is within the jury's discretion. The defendant concedes that the state proved beyond a reasonable doubt the statutory aggravating circumstance that "[t]he defendant was previously convicted of one (1) or more felonies than the present charge, whose statutory elements involve the use of violence to the person." T.C.A. § 39-13-204(i)(2). The following three mitigating circumstances were also stipulated by the parties and presented to the jury:

> (1) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;
>
> (2) The capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected the defendant's judgment; and
>
> (3) Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing.

T.C.A. § 39-13-204(j)(2), (8), and (9).

13

Although the defendant submits that the jury failed to consider any mitigating circumstances, there is nothing in the record to support this assertion. Rather, the proof undeniably shows that the defendant has been previously convicted of five separate robberies and was on parole at the time of this conviction. Although the record was replete with evidence that the defendant used cocaine excessively, the jury could have reasonably concluded that the defendant could not conform to society's laws. Accordingly, this court cannot conclude that the jury abused its discretion in imposing a sentence of life without possibility of parole.

## II. AGGRAVATED BURGLARY

The defendant was charged with the aggravated burglary of the residence of Pauline Cox and James Collins and with the robbery of Mr. Collins. Mary Ward testified that on the morning of November 18, 1993, she was working as a night sitter for Ms. Pauline Cox when the defendant knocked on Ms. Cox's door and asked if Ms. Cox's son, James Collins, was awake. She stated that when she told the defendant that Mr. Collins was not awake, he left. Then he returned a few minutes later and forced his way inside the home, grabbing Ms. Ward around her collar. He dragged her into the kitchen and searched through the kitchen drawers. Ms. Cox heard the incident and started screaming for her son. Mr. Collins appeared and pulled the defendant off Ms. Ward. The defendant began scuffling with Mr. Collins, and Ms. Ward left the room to call 911.

James Collins, son of Ms. Cox, testified that on the morning of November 18, 1993, he was awakened by noises in the front of the house. When he came into the kitchen, he saw the defendant. After Mr. Collins subdued the defendant, the defendant said that he would leave. Mr. Collins stated that after the defendant left, however, he discovered that his billfold was missing. He testified that the billfold contained approximately sixty dollars. He stated that the defendant had apparently

14

taken his wallet during the struggle. Mr. Collins identified a small broken knife that he had found on the floor after the defendant left.

Mr. Collins testified that he knew the defendant before this incident, because he had bought two cartons of cigarettes from him for twenty dollars about two and one-half months before. He stated that he owed the defendant no money and had only seen him that one time before. He said that he did not see a knife in the defendant's hand. On cross-examination, Mr. Collins admitted that he and the defendant had scuffled in the kitchen and that he had found the knife in the living room.

John Connell, the defendant's stepson, testified that the knife admitted into evidence was his knife and had been kept in a drawer in his mother's house. However, on cross-examination, he stated that his knife had some writing on it, but the knife admitted into evidence did not.

Lois Montgomery, criminal investigator with the Dyersburg Police Department, testified that she conducted an interview with the defendant on November 18 and that she taped the interview at the defendant's request. A transcript of the defendant's statement was then admitted into evidence. The defendant had told Ms. Montgomery that he had gone to the victim's home to collect money owed to him for cigarettes and that Ms. Ward had allowed him into the home. On cross-examination, Ms. Montgomery stated that the defendant appeared to be under the influence of drugs when she had spoken with him immediately after he was taken into custody on November 18.

Cecil Marvin Ferguson, nephew of Pauline Cox, testified that Mr. Collins told him on the day after the incident that the defendant had taken his billfold. With this witness, the state rested its case, the defendant presented no proof, and closing

arguments were heard by the jury. The jury was instructed, and after deliberation, found the defendant not guilty on count two, robbery, but guilty on count one, aggravated burglary.

## A. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to sustain his conviction for aggravated burglary. He maintains that in weighing the evidence, the jury must have concluded that no property was taken from the victim or it could not have found the defendant not guilty on the robbery count. He contends that if no property was taken by the defendant it would be impossible for the jury to convict him of burglary because the state did not prove beyond a reasonable doubt that his intent was to commit a felony or theft when he entered the victim's home without consent. Rather, the defendant asserts that because the proof showed that he had smoked an excessive amount of crack cocaine, the culpable mental state required to prove his intent to commit a felony was negated. The state contends that the intent to commit a felony was established by circumstantial evidence and that the defendant's argument concerning the negation of a culpable mental state due to drug use was presented to the jury and rejected. We agree.

A person commits aggravated burglary by entering a habitation without the effective consent of the property owner, with the intent to commit a felony, theft or assault. T.C.A. §§ 39-14-402(a)(1) and -403(a). The specific intent may be established by circumstantial evidence. Bollin v. State, 486 S.W.2d 293, 296 (Tenn. Crim. App. 1972). When one unlawfully enters an occupied dwelling that contains valuable property, a jury is entitled to infer that the entry was made with the intent to commit a theft. Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973).

16

In the light most favorable to the state, the proof shows that the defendant forced his way into Ms. Cox's home and physically assaulted Ms. Ward and Mr. Collins. Although the defendant asserts that he went to the Cox home to collect on a debt, there is no evidence that he told anyone that he was there to get money owed him. In our view, the jury could have found, based on the evidence presented, that the defendant entered the Cox home with the intent to rob the occupants of the home. We conclude that there is sufficient evidence to support the jury's determination of guilt beyond a reasonable doubt for the crime of aggravated burglary.

## B. AGGRAVATED BURGLARY SENTENCE

The defendant asserts that the sentence of nine years imposed by the trial court for the aggravated burglary conviction is excessive. However, the defendant makes only a general claim and does not assert how or why the sentence is excessive. The defendant does not claim that the trial court improperly applied aggravating circumstances, failed to apply mitigating circumstances, or otherwise misused the sentencing laws. He also fails to show that the trial court improperly applied the sentencing principles. In State v. Richard J. Crossman, No. 01C01-9311-CR-00394, Wilson County (Tenn. Crim. App. Oct. 6, 1994), app. denied (Tenn. Jan. 3, 1995), this court stated that when a defendant makes only a general claim that the sentence imposed was excessive, "it is not our function to rummage through a record to glean support for a defendant's general claim of excessive sentencing and such a claim runs a high risk of the sentence being summarily affirmed." Slip op. at 12.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section notes, the burden is on the defendant, as the appealing party, to show that the sentence is improper. We conclude that the defendant has failed to meet this burden in this case. The weight to apply to

the enhancing and mitigating factors in this case is within the discretion of the trial court. We view the sentence to be appropriate under the record before us.

In consideration of the foregoing and the record as a whole, we affirm the defendant's convictions and sentences for aggravated burglary and felony murder.

_____
Joseph M. Tipton, Judge

CONCUR:


_____
Paul G. Summers, Judge


_____
Jerry L. Smith, Judge