IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
FEBRUARY 1998 SESSION

FILED

November 3, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 03C01-9708-CR-00353 |
| | ) | |
| Appellee, | ) | McMINN COUNTY |
| | ) | |
| V. | ) | |
| | ) | HONORABLE R. STEVEN BEBB, |
| ELISA COCHRAN, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (FELONY MURDER) |

FOR THE APPELLANT:

KENNETH F. IRVINE, JR.
Eldridge, Irvine & Hendricks
606 W. Main St., Suite 350
P. O. Box 84
Knoxville, TN 37901-0084
(Appeal)

THOMAS E. KIMBALL
Assistant Public Defender
110 ½ Washington Avenue, N.E.
Athens, TN 37303
(Trial)

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

ELIZABETH B. MARNEY
Assistant Attorney General
425 Fifth Avenue North
Second Floor, Cordell Hull Building
Nashville, TN 37243-0493

JERRY N. ESTES
District Attorney General

SANDRA DONAGHY
Assistant District Attorney
10th Judicial District
Washington Avenue
Athens, TN 37303

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# <u>OPINION</u>

The defendant, Elisa Cochran, was convicted of felony murder and received a mandatory sentence of life imprisonment. This is an appeal as of right of that conviction.

The defendant presents three issues for review: (1) whether the evidence was insufficient to convict her of first degree-felony murder; (2) whether she was denied a fair trial by the introduction of her husband's testimony, and his prior statements, and by the circumstances surrounding his interrogation; and (3) whether the trial court erred in failing to require the state to elect between first degree felony murder and premeditated first degree murder at the close of its proof.

The judgment is affirmed.

The relevant facts are as follows: On April 26, 1995, a body was discovered in a remote area of McMinn County. The Tennessee Bureau of Investigation assisted the McMinn County Sheriff's Department in the investigation. Special Agent T. J. Jordan of the T.B.I., was the primary investigating officer.

Special Agent Jordan testified that the body was found on an old road bed some two hundred and ninety feet from county road 429. The old road bed was accessible only by foot. The body was laying in a face down position and was fully clothed. It was in an extreme state of decomposition and was totally unrecognizable. The victim had been killed by a single gunshot wound to his head. The bullet had entered the victim near the his left eye and exited from the back of his head. The

2

evidence suggested that the victim had been shot where he was found.  One live round of ammo was found at the scene.

From dental records and finger prints, it was determined that the victim was Benjamin Smith.  Mr. Smith graduated from the University of Tennessee in 1995 and worked at Martin Marietta in Portsmouth, Ohio.  His parents lived in Knoxville, and he was visiting them on Easter weekend, 1995.  Easter Day was April 16.  When the victim did not return, his parents reported him missing.

After learning the identity of the victim, the investigators developed several leads.  From the victim's bank records, they knew that he went to an ATM in Knoxville at 2:45 a.m., on April 16, 1995, and withdrew $200.00.  From the video at the ATM machine, they knew that someone was in the driver's seat of his truck at that time.  They learned from his credit card records that he had made a purchase that evening at Hooter's Restaurant in Knoxville.  Perhaps more importantly, the investigation revealed that the victim frequented strip clubs in the Knoxville area.  Several clubs were contacted, and the investigators learned that the victim had been at the Mouse's Ear West on Kingston Pike in Knoxville on Easter weekend.  The investigators then inquired as to whether any of the dancers at the Mouse's Ear lived in McMinn County.  They found that the defendant, Elisa Cochran, a dancer, lived there.

The manager and three dancers from the Mouse's Ear testified.  The manager testified that the defendant worked on the night of April 15th from 5:50 p.m. to 12:56 a.m..  The three dancers knew the victim, and they all saw him at the Mouse's Ear on April 15th. Two of the dancers saw the defendant talking with the victim.

3

A waitress from Hooter's Restaurant testified that she sold the victim a carry-out order of crab legs on April 15th. Two of the dancers observed the defendant eating seafood that night.

One of the dancers testified that she had known the victim for about two years and that she and another dancer had gone shopping with the victim in downtown Knoxville. Another dancer said that on April 15th, the victim asked her to go shopping with him.

Agent Jordan interviewed the defendant. She admitted that she had worked at the Mouse's Ear West on April 15, 1995. She claimed she left at 2:00 a.m. and drove her boyfriend's truck to his house where she spent the night. Her boyfriend's name was Burch Russell. She also told the investigator that her ex-husband, Brian Cochran, had been to the Mouse's Ear about three weeks prior to April 15th and had become jealous over a customer watching her dance. She said that her ex-husband owned a nine millimeter handgun. She told the investigator that she did not know anything about the murder.

Mr. Jordan interviewed Brian Cochran on May 12, 1995. He and the defendant had divorced four days earlier. He was also given a polygraph examination.

The polygraph examiner testified without objection that Cochran practiced deception or was untruthful in his responses to three relevant questions. Those

4

questions were (1) were you present when the man was shot; (2) did you shoot that man; and (3) do you know for sure who shot that man. The trial judge gave the jury the following instructions after the polygraph examiner testified:

> I think that I should instruct the jury at this time that the polygraph has not been recognized in Tennessee courts as reliable enough to be admitted into evidence as probative of a witness' truthfulness or untruthfulness. The polygraph is used by law enforcement as an investigative tool. This evidence is not admitted and should not reflect on the credibility of any witness.

After Cochran was told that he failed the test, he told Special Agent Jordan and the polygraph examiner that his wife, Elisa, had told him about killing this individual. He also told them that his wife had described how she shot the individual and where she got the gun. No objection was made by the defense to that testimony nor to similar testimony from Special Agent Jordan.

With the information he received from Brian Cochran as to the location of the gun, Special Agent Jordan went to the residence of Eby Garwood. Mr. Garwood produced a nine millimeter semi-automatic handgun which was manufactured by Glock. Agent Jordan unloaded the weapon and found a round of ammo similar to the round found at the murder scene.

The defendant was brought to the McMinn County Justice Center at 3:30 a.m., on May 12, 1995. She gave the following statement:

> On Saturday the 15th of April, 1995, I met the guy in the Mouse's Ear while I was working. I don't remember his name. He told me he had taken some of the girls shopping and stuff. He left after I talked to him. We didn't set up anything for when I got off. I think I got off early that night. It was a slow night. When I walked outside I went to my truck and he was hiding in my truck and he had a gun. He made me drive to his truck. We got in his truck and we drove around for awhile. I was driving his truck. He talked to me about having sex with him. He

5

wanted to go to a teller machine. I don't know why he got the money. I don't remember which one we went to. I drove up to it and he got out to get the money. He still had the gun on him. I think. I don't know why I didn't drive off. I was scared. We went back to my truck and we got in my truck and drove. He told me to drive to my house. He had asked me if I had a boyfriend and I told him no. I told him I lived alone. We headed straight to McMinn County. I didn't talk much, but he did. He told me I looked good and he touched me and stuff. He rubbed my legs, between my legs, and my breasts. I let him, because I was scared. He played with himself too.

Once we got into McMinn County I told him I had a live-in boyfriend and he got mad. He told me to pull over. I pulled over off the side of the road. He told me to get out of the truck. I just started walking towards the woods up a hill. We had to go under a wire and then there was a rock. He had the gun and he was mad at me. I knew he was going to kill me. We just walked up the hill and I was in front of him. I heard something behind me and turned around. He stumbled or something. He was looking around and I picked the gun up off the ground. I don't know if he came toward me. I told him to leave me alone, and I just shot him. I shot him in the head. The gun got hung up after I shot him. I only shot him once. After he was shot, he fell on his face. I left and went to my mother's house in Englewood. I got my brother's car and went back. It was daylight then. I was by myself. When I got back to him, I took his wallet and check book. The money he had gotten was in my truck. I took the stuff, because I didn't know what to do. I threw the wallet and check book out the window of my truck after I picked it up from my mom's. I drove around on back roads for awhile. I don't remember where I threw his stuff out. His keys were in my truck and they have a knife on them. I don't know where his truck is at. The keys are on top of a locker at the Mouse's Ear. I haven't seen the truck since that night. After I drove around I went to Burch's. I don't remember how much money it was. I gave it to Burch. He doesn't know where I got it. I told Burch about it last night after Deputy Joey Guy came to see him. I told him I had to do it, but didn't give him any details.

I had taken the gun from Burch's. I got it, because someone tried to get in my truck after work one night. I was leaving work and someone flashed their lights at me and I pulled over. They came up to me, forced a kiss on me, and tried to get me to go with them. That's why I had the gun.

The guy I shot was wearing a suit and had a hat on. He wore glasses. He had boots on. He said he was from Ohio.

I didn't report it because of my job. I knew people wouldn't understand. I knew I would have to go to jail.

The defendant was arrested after giving this statement.

6

There was evidence which corroborated part of the defendant's statement. The keys to the victim's truck were found on top of the locker at the Mouse's Ear where the defendant said they would be. Eby Garwood and Burch Russell testified that Garwood took the Glock handgun to Russell's house and that it remained there for about a week. Garwood also testified that when he left the gun, there were fifteen rounds with aluminum casings in the clip. When he retrieved the gun, there were two to four brass casings in the clip in addition to the aluminum casings. This corroborated the defendant's testimony that she took the gun from Russell's house.

There was evidence which refuted part of the defendant's statement. Employees of the Mouse's Ear testified that the club's policy was for a male employee to escort the dancers to their vehicles after work. This cast some doubt upon the defendant's testimony that the victim was waiting for her in her truck. Burch Russell testified that he was not the defendant's boyfriend. Rather, he allowed her to live at his house because she was pregnant and because she had told him that the child may be his child. He also refuted her testimony that she gave the $200.00 taken from the victim to him.

Brian Cochran, the defendant's ex-husband, was called as a witness by the State. Cochran testified the defendant told him she had a set of keys from a truck and that she needed to talk to him. She told him someone had been shot. Upon objection by the defendant, the trial court disallowed Brian Cochran's testimony and instructed the jury not to consider it.

The defense offered no evidence.

7

The indictment was a three count indictment. In the first count, the defendant was indicted for premeditated first degree murder. The jury found her guilty of second degree murder. In the second count, the defendant was indicted for felony murder while in the perpetration of especially aggravated robbery. She was found guilty as charged. In the third count, the defendant was indicted for especially aggravated robbery. The trial court had instructed the jury that if it found the defendant guilty of Count Two or of a lesser included offense, then it should not return a verdict upon Count Three. However, the jury apparently misunderstood the trial court's instructions and found the defendant guilty of the lesser included offense of theft under five hundred dollars ($500.00), a misdemeanor. The trial court merged the second degree murder conviction into the felony murder conviction and dismissed the theft conviction.

The first issue presented for review is whether the evidence was sufficient to convict the defendant of first degree felony murder.

In determining the sufficiency of the convicting evidence, this Court does not reweigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990), State v. Butler, 900 S.W.2d 305, 309 (Tenn. Crim. App. 1994). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all the factual issues raised by the evidence are resolved by the trier of fact, not this Court. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). A guilty verdict, approved by the trial judge, credits the testimony of the State's witnesses and resolves all conflicts of testimony in favor of the theory of the State. State v. Hatchett, 560 S.W.2d 627, 630. (Tenn. 1978). Since a verdict of guilty removes the presumption of innocence and replaces it with a presumption

of guilty, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the jury. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court will not disturb a verdict of guilty due to the sufficiency of the evidence unless the facts contained in the record and any inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the accused guilty beyond a reasonable doubt. Id. Because the sufficiency of the evidence is the key inquiry in this case, the guiding principle is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 99 L.Ed. 2d 2781 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn.1985).

The State established that Benjamin Smith had been shot to death in a remote area in McMinn County. The State placed the defendant with the victim on the evening of his death. The State located the murder weapon and placed it in the hands of the defendant during the time period the victim was killed. Most significantly, the State obtained a confession from the defendant in which she admitted that she shot and killed the victim. Finally, the State proved that the defendant did not report the death of the victim and attempted to avoid prosecution.

In order to obtain a conviction for felony murder in this case, the State was required to prove (1) a reckless killing of another, (2) committed in the perpetration of a robbery. T.C.A. §39-13-202 (a)(2). In order to obtain a conviction for especially aggravated robbery, the State had to prove (1) the intentional or knowing theft of property from the person of another by violence or putting the person in fear, (2)

9

accomplished with a deadly weapon, and (3) when the victim suffers serious bodily injury. T.C.A. §39-13-401 (1991), §39-13-403 (a).

It is a long-standing tenet of Tennessee law that to sustain a conviction for felony murder, the killing must have been done in pursuance of the felony and must not merely be collateral to the unlawful act. State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988). In other words, for a murder to be done in "perpetration of" the felony, "the killing must have had an intimate relation and close connection with the felony and not be separate, distinct, and independent from it." Farmer v. State, 201 Tenn. 107, 296 S.W.2d 879, 883 (1956) (citing Wharton on Homicide, §126).

The State contends the defendant robbed the victim of $200.00 which the victim took from the ATM machine. Evidence that a person took the property of another after killing him and appropriated it to his own use is sufficient to sustain a conviction of murder in an attempt to commit a robbery, though no previous purpose to rob appears, since his act raises a strong presumption that he intended to do what he afterwards voluntarily did. Mellendore v. State, 191 S.W.2d 149, 142 (Tenn. 1945) (quoting Wharton on Homicide, 3d.Ed. 188). The evidence relied upon by the State to establish the underlying felony is the admission of the defendant that she took this money. However, the defendant's statement was that the money was in her truck and not on the person of the victim when he was killed.

The defendant relies upon the unreported case of State v. Dunn, (No. 03S01-9211-CR-00104, S.Ct. 1993). In that case, the Supreme Court found that the

10

evidence was inadequate to support the conviction of the defendant for felony murder.

In <u>Dunn</u>, the evidence established that the badly decomposed body of 16 year old Kathy Able was found in a creek bed in Washington County. She had last been seen alive on March 18, 1989, which was almost two months before her body was discovered. The record also established that on the day beforehand, the victim was seen kissing the defendant. For the remainder of the evening and into the next morning, the victim, the defendant, and Mary Icenhour drove around drinking beer and ingesting prescription drugs. Icenhour was eventually dropped off at her home, and the victim remained with the defendant. When the victim was found, she was naked below the waist. Bruises were found around the neck. There were no signs of trauma to the genital region of the body nor was it possible to test for the presence of sperm. Based upon that evidence and other circumstantial evidence, the jury convicted the defendant of felony murder after concluding that the murder occurred during the commission or attempt to commit a rape.

The Supreme Court concluded that the evidence was insufficient to support the conclusion beyond a reasonable doubt that the murder occurred during the commission of or in an attempt to commit a rape. Although there was circumstantial evidence of sexual activity, this evidence was not sufficient to establish that the defendant raped or attempted to rape the victim. The Court then held that circumstantial evidence was sufficient to establish beyond a reasonable doubt that the defendant killed Kathy Able. The Court reversed the conviction for felony murder and modified the judgment to reflect a conviction of second degree murder relying

11

upon the rule of law that a homicide, once established, is presumed to be murder in the second degree.

However, absent the portions of Defendant's statement to police which allude to a kidnapping by the victim and a shooting in self-defense, a review of the evidence in this case, and all inferences which may be drawn therefrom, reveals the following.

The victim was in the company of the Defendant after she got off work from the Mouse's Ear West in the early morning hours of April 16, 1995. At approximately 2:44 a.m. on April 16, the victim withdrew $200.00 from an ATM machine, and a person (the strong inference being the Defendant) was driving the victim's vehicle at the time the money was withdrawn. The Defendant shot the victim once in the head with a nine millimeter pistol which had been in her possession prior to the homicide. The victim was shot at a remote location approximately 100 yards from a county highway in McMinn County. The Defendant resided in McMinn County and the victim had no ties to McMinn County. All of the cash which had been recently withdrawn by the victim from the ATM was missing. The pants pockets of the victim were turned out as if someone had reached in to empty the contents. A few coins were found near the victim's body. His wallet and checkbook were also missing. The victim's pickup truck was later found at a motel parking lot after his body had been discovered. The keys to the vehicle were located on top of a locker at the Mouse's Ear West where the Defendant stated she had placed them. When initially interviewed by a T.B.I. agent, the Defendant denied having any knowledge of the victim's death.

The controlling principle of law on this issue is succinctly stated by the majority of a panel of our court in <u>State v. James Clayton Young, Jr.</u>, C.C.A. No. 01C01-9605-CC-00208, Rutherford County (Tenn. Crim. App., Nashville, May 22, 1998). It reads as follows:

> In our view, a jury is entitled to accept that portion of the defendant's pre-trial statement or testimony that it deemed credible and reject that which it deemed to be false. <u>State v. Gilbert</u>, 612 S.W.2d 188, 190 (Tenn. Crim. App. 1980)(citing <u>Batey v. State</u>, 527 S.W.2d 148 (Tenn. Crim. App. 1975)). 'In confessions or statements of the kind voluntarily made by the accused the jury must take the whole of this statement or confession and weigh it as they weigh the other evidence, rejecting some part if they desire to do so and giving credit to other parts of the statement if they have a sufficient reason to do so under all the evidence as it is introduced.' <u>Espitia v. State</u>, 288 S.W.2d 731, 733 (Tenn. 1956). This quote from the <u>Espitia</u> opinion is consistent with the general rule:
>
> > It is for the jury to say what weight shall be given to the several parts of the statement, for they may well believe that part which charges the prisoner, and reject that which tends to exculpate him.
>
> 20 Am. Jur., <u>Evidence</u>, § 488 (1939 & Supp. 1966); <u>see</u> 29A Am. Jur. 2d, <u>Evidence</u>, § 1431 (1994).

<u>Young</u>, C.C.A. No. 01C01-9605-CC-00208, slip op. at 17.

In light of the majority opinion in <u>Clayton</u>, the evidence was sufficient to sustain the conviction of felony murder.

This issue is without merit.

The second issue presented for review is that the defendant was denied a fair trial by the introduction of her husband's testimony and his prior statements and by the circumstances surrounding his interrogation.

13

Statements attributed to Brian Cochran or made by him came into evidence three times. Special Agent T. J. Jordan testified that he took a statement from Cochran in which Cochran implicated the defendant. Although the defendant did not object to that testimony, the trial court instructed the jury that that statement was not to be considered as evidence of guilt.

Polygraph examiner Malcomb Elrod testified that Cochran failed the polygraph examination. Cochran then stated that his wife told him about killing this individual. She also told him that she had described how she had shot him and where she had obtained the gun. The defendant did not object to this testimony.

Finally, Brian Cochran testified that his ex-wife, the defendant, told him she had a set of keys from a truck and that she needed to talk to him. She also told him someone had been shot. The defendant objected to Cochran's testimony, and he was not allowed to testify further. The trial court instructed the jury to disregard the testimony.

The testimony of Special Agent Jordan and polygraph examiner, Elrod, was clearly inadmissible. However, error may not be predicated upon a ruling admitting evidence unless a substantial right of a party was affected and unless a timely objection was made. Rule 103(a), Tenn. R. Evid. No objection was made by the defendant to this testimony. Furthermore, the evidence was cumulative and even had it been admitted over the objection of the defendant, then the error would have been harmless.

14

The testimony of Brian Cochran at the trial was not incriminating to the defendant, and, therefore, it did not affect a substantial right of the defendant. Furthermore, the trial court instructed the jury to disregard the evidence.

This issue is without merit.

The final issue presented for review is whether the trial court erred in failing to require the State to elect between first degree felony murder and premeditated first degree murder at the close of its proof.

The defendant argues that because only one person had been killed, the State was required to elect whether it was seeking a conviction for first degree felony murder or for first degree premeditated murder. Although the defendant may demand that the State elect between factual occurrences in an indictment, the State is not required to elect between separate charges in the same indictment. State v. Henley, 774 S.W.2d 908, 916 (Tenn. 1989).

This issue is without merit.

For the reasons hereinabove set forth, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, Judge

CONCUR:

15

_____
JERRY L. SMITH, Judge


_____
WILLIAM B. ACREE, JR., Special Judge