IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

JUNE 1996 SESSION

FILED

December 1, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 02C01-9508-CC-00245 |
| | ) | |
| | ) | Gibson County |
| v. | ) | |
| | ) | Honorable Dick Jerman, Jr., Judge |
| | ) | |
| TIMOTHY ROBERSON, | ) | (First degree murder and especially |
| | ) | aggravated robbery) |
| Appellant. | ) | |

For the Appellant:

Mike Mosier and
J. Colin Morris
P.O. Box 1623
204 West Baltimore
Jackson, TN 38302-1623

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
        and
Michelle L. Lehmann
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

Clayburn L. Peeples
District Attorney General
109 E. First Street
Trenton, TN 38382-1841

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

# O P I N I O N

The defendant, Timothy Roberson, appeals as of right from a jury verdict of guilt in the Gibson County Circuit Court for first degree murder and for especially aggravated robbery, a Class A felony. The trial court sentenced the defendant to life imprisonment without parole for the first degree murder conviction and to fifteen years in the custody of the Department of Correction as a Range I, standard offender for the especially aggravated robbery conviction, to be served consecutively. On appeal, the defendant contends that:

> (1) the evidence is insufficient to support his conviction for felony murder;
>
> (2) the felony murder statute, T.C.A. § 39-13-202(a)(2), is unconstitutional;
>
> (3) the trial court erred by admitting into evidence over his objection a photograph of the victim;
>
> (4) the trial court erred by failing to charge the jury regarding the lesser offenses of robbery and theft;
>
> (5) the statutory aggravator set forth in T.C.A. § 39-13-204(i)(5) is unconstitutional because it is vague and cannot be understood and applied by jurors; and
>
> (6) the trial court erred by imposing consecutive sentences.[1]

We hold that the evidence is sufficient to support the felony murder conviction and that the trial court committed no reversible error.

Clyde Smith, the father of the victim, Robert Smith, testified that he saw his son at approximately 9:30 p.m. on November 26, 1993. He said that on November 28, his mother called and told him that she had not seen the victim over the Thanksgiving weekend and that he always came by on Saturday. Mr. Smith stated that

---

[1] After the briefs were filed in this case, the defendant filed a pro se "Amended Petition to the Original Appeal" seeking to present additional issues. However, a defendant may not proceed pro se on appeal when he or she is also represented by counsel. State v. Burkhart, 541 S.W.2d 365, 371 (Tenn. 1976); State v. Cole, 629 S.W.2d 915, 917 (Tenn. Crim. App. 1981).

he and his other son, Charles Smith, went to the victim's apartment. He testified that he discovered the door to the apartment open and the lights out. According to Mr. Smith, Charles entered the apartment and called the victim's name, and when the victim did not respond, they left the apartment, believing that the victim had stepped outside. He said that they returned at about 6:30 p.m. and discovered the victim dead, lying on his back in a pool of blood in the kitchen. He testified that the apartment had been ransacked. Mr. Smith stated that he later found several items missing from the victim's apartment, including a VCR. He also said that he told Sergeant Morris that the victim generally carried a large sum of cash with him. According to Mr. Smith, the victim had some learning disabilities, although he was not classified as being mentally retarded and was able to function in society.

Dr. Jerry Francisco, a pathologist, testified that he along with Dr. Violet Hnilica conducted an autopsy of the victim. He stated that the examination of the victim showed that the cause of death was multiple injuries to the body. He said that the victim suffered blunt-force injuries to the head, cuts to the neck and a group of stab wounds to the chest. In Dr. Francisco's opinion, any of the types of injuries could have caused the victim's death. He testified that the injuries caused damage to the brain, the voice box, the lungs and the heart. He stated that there were thirteen stab wounds to the chest that were deep, penetrating the victim's heart, lungs and ribs. He said that two of the cuts to the victim's neck severed the jugular vein. Dr. Francisco described the victim's blunt-force injuries to the head as a broken skull extending to the base of the skull. On cross-examination, Dr. Francisco testified that it was possible that death or unconsciousness could have occurred after the first few injuries were inflicted. He also conceded that if the victim was unconscious after the first few injuries were inflicted, he would not have felt any pain. Dr. Francisco admitted that there was no way for him to determine how quickly the victim died, but he said that it would have taken at least minutes.

Sergeant Jerry Morris of the Milan Police Department testified that he responded to a call regarding the victim.  He said that he discovered the victim lying on his back and partially on his right side in the kitchen surrounded by blood on the floor, wall and refrigerator.  He stated that the victim was wearing a T-shirt and jeans and did not have shoes or socks on.  Sergeant Morris testified that he found a towel with blood on it hanging on a towel rack in the bathroom.  He also said that the bedroom had been ransacked in that clothes had been taken out of drawers and thrown at the foot of the bed.  Sergeant Morris stated that the television in the living room was on but that the cable had been disconnected.

Sergeant Morris testified that the defendant was interviewed by the Milan Police Department on three occasions: (1) during the initial investigation, (2) on November 29, 1993, after Sergeant Morris talked to the defendant's girlfriend, Clara Langley, and an informant, and (3) on December 5, 1993.  He said that he obtained a ring from Ms. Langley and that the informant told him about seeing the defendant with the VCR and the movies.  Sergeant Morris said that during the second and third interviews of the defendant, the defendant gave a statement.  He testified that the defendant also gave a statement to the Tennessee Bureau of Investigation on November 30, 1993.  Sergeant Morris stated that after the defendant's second interview, he recovered the victim's ring, approximately nine movies, VCR and a remote control, with the movies and the VCR being found at the defendant's home.  He said that he verified that the VCR belonged to the victim.  He testified that he also recovered the victim's wallet and diamond ring.  Sergeant Morris stated that the defendant took him to where the defendant disposed of the wallet in a bush approximately fifty feet from Salinger Road.  He testified that he recovered the victim's paycheck from a Texaco Station in Milan.  He also identified the defendant's hiking boots and stated that

4

the defendant told him that he was wearing the boots during the time of the victim's death.

The defendant's statement given to the Milan Police Department on November 29, 1993, reflects that the defendant claimed that he was at his brother's house and then went to the house of Nikki Wright between the hours of 9:00 p.m. and 2:00 a.m on November 26, 1993. It also shows that the defendant told Sergeant Morris that he purchased a ring and VCR from a guy who was driving a 1991 or 1992 Grand Prix about 10:30 or 11:00 p.m. It states that the defendant told the officers that he paid fifty dollars for the ring and that he traded an air pump for the VCR, although he did not know who owned the items. The statement reflects that the defendant asserted that he got the airpump from the mother of his girlfriend and that the movies belonged to other people. It also states that the defendant denied harming the victim and that the defendant claimed that he had not seen the victim. In the interview, the defendant explained that his prints could be in the apartment because he visited the victim's home approximately three to four months earlier.

The defendant's written statement given to the TBI on November 30, 1993, reflects that the defendant admitted killing the victim. The defendant told the officers that he was addicted to crack cocaine and that he had borrowed money from the victim, with whom the defendant worked, on previous occasions to purchase drugs. He told them that he and the victim were paid on the Wednesday before Thanksgiving and that he spent two hundred dollars on crack cocaine which he smoked on Friday. The defendant said that he went to the victim's apartment between 11:30 p.m. and midnight because he was out of money and wanted to get some more crack cocaine. The defendant said that the victim was watching television when he arrived and that he was wearing a T-shirt and pants but no socks or shoes. He said that he asked the victim for twenty-five dollars, but the victim refused, saying that the defendant owed him

5

twenty-five dollars from one week earlier. The defendant said that he became mad and that he and the victim argued, pushed and shoved each other near the dining table. He stated that the victim told him to leave and then slapped him on the right side of his face.

The statement also reflects that the defendant told the officers that he "lost it" when the victim slapped him and that he grabbed a brown kitchen knife and struck the victim in the middle of the chest. The defendant said that he could not stop and that after the knife broke, he began kicking the victim in the head, shoulders and side while the victim was lying in the kitchen floor. He said that he then picked up a silver knife and stabbed the victim again in the chest, although he could not recall how many times. The defendant told the officers that the victim was still alive and was trying to remove a box cutter from his left pocket to try to stop him when he took the box cutter from the victim and cut the victim's throat. The defendant stated that he was so mad that he could not stop and claimed that he did not mean to do it but that he lost his mind. According to the defendant's statement, the defendant went to the bathroom and wiped his hands on a towel at some point.

The defendant's statement to the TBI also shows that the defendant said that he looked throughout the apartment for money or anything to sell, including the defendant's bedroom dresser drawers. He also admitted taking the victim's wallet, keys, ring, VCR and movies from the victim's apartment. According to the defendant, the victim's wallet contained one hundred and fifty dollars in cash and a paycheck in the amount of one hundred and fifty-nine dollars. The defendant told the officers that he went to his cocaine dealer's apartment in Milan immediately after leaving the victim's apartment and purchased crack cocaine. According to the defendant, he took the VCR and movies to his apartment and threw the victim's wallet into a field. The statement

6

reflects that the defendant conceded cashing the victim's paycheck at a Texaco the next morning and using the money to purchase more crack cocaine.

Sergeant Morris also testified that the defendant gave a statement on December 5, 1993. The statement reflects that the defendant denied killing the victim and that he claimed that he had blackout spells and when he awoke, he saw a "figure," although he saw no one. On cross-examination, Sergeant Morris testified that the defendant was crying and appeared to be remorseful during the statement given to the police department on November 30, 1993. He also stated that his investigation did not reveal anything that would conflict with what the defendant told him had occurred on the night of the murder.

Mike Cleary, an employee of Texaco, testified that the defendant came into the store at approximately 5:30 a.m. and asked him to cash the victim's payroll check. He said that he cashed the check, although the defendant told him that he did not have any identification with him.

Bobby Mosley, owner of the Jewel Box in Milan, identified a lady's diamond ring that he sized for the defendant. He testified that he had earlier sold the ring to the victim.

Clara Langley testified that she was living with the defendant at the time the offense occurred and that she worked with both the defendant and the victim. She identified the lady's diamond ring as the one the defendant gave to her at 4:00 a.m on the Saturday morning after the victim's death when the defendant asked her to marry him. Ms. Langley said that she asked him where he got the ring and that the defendant told her that he got it at a jewelry store in Humboldt. She also identified the VCR, remote control and videotapes and stated that the defendant brought them into their

7

house on either Saturday or Sunday.  She said that when she asked the defendant where he got the VCR, the defendant told her that he had gotten the items from a man who had a flat tire and he claimed that he traded an air pump for the VCR.  On cross-examination, Ms. Langley testified that she suspected that the defendant was spending a lot of money on drugs around the time of his arrest.  She also stated that the defendant was real nervous on Saturday morning.

Dr. Lynn Zager, a clinical psychologist, testified that she examined the defendant on November 2, 9, and 16, 1994, to determine the defendant's competency to stand trial and his mental condition at the time of the offense.  She said that her evaluation showed that the defendant was an alcoholic and was addicted to cocaine and marijuana.  She stated that the defendant was intoxicated at the time of the offense.  In Dr. Zager's opinion, the defendant's behavior was partly a result of his intoxication, and the defendant's intoxicated state compromised the defendant's ability to conform his behavior to the requirements of the law.  Dr. Zager testified that the defendant's initial denial of guilt was consistent with his determination that the defendant suffered from substance abuse.  She stated that she found the defendant to be remorseful about his conduct.

Dr. Zager's psychological evaluation report shows that the defendant's father was an alcoholic and that his brother and sister have serious substance abuse problems.  It reflects that his parent's divorced at an early age and that the defendant's stepfather was verbally abusive to the defendant.  The report states that the defendant, a high school graduate, began drinking and smoking marijuana at age eighteen and began using cocaine in 1991.  It shows that the defendant's substance abuse became critical in 1992 when he lost his car and his job.  The report reflects that the defendant stopped using drugs and alcohol for a period of time but began abusing alcohol, marijuana and cocaine approximately three weeks before the offense occurred.  The

8

results of the report are that although the defendant has maintained a relatively stable work history, he engages in behaviors that would warrant a diagnosis of a conduct disorder or antisocial personality disorder. It states that the defendant functions in the low average range of intelligence. The report shows that Dr. Zager's findings were that the defendant was competent to stand trial and that although the defendant's ability to conform his behavior to the requirements of the law was compromised because of his substance abuse, the defendant's ability to appreciate the wrongfulness of his behavior was not significantly impaired. In Dr. Zager's opinion, the defendant was sane at the time of the offense.

Richard Clark, a friend of the defendant, testified that the defendant came by his house at approximately 1:30 a.m on November 27, 1993. He said that the defendant was "high" from smoking crack cocaine, "kind of nervous," and "jittery." Mr. Clark stated that the defendant had some crack cocaine with him and that the defendant smoked while he was with him.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant asserts that the evidence does not support the jury's verdict finding him guilty of first degree murder committed during the perpetration of a robbery. Specifically, he contends that the proof does not establish beyond a reasonable doubt that the robbery was closely related to the homicide. He argues that the evidence instead establishes that the killing occurred collateral to and not in the perpetration of the aggravated robbery. The defendant asserts that he went to the victim's home intending to borrow money from the victim and not with the intent to rob the victim. He claims that it was only after the killing occurred that he decided to take the victim's money. The state asserts that the jury could have reasonably concluded that the murder was accomplished so that the defendant could take the victim's money from him. We agree. In our view, the evidence is sufficient.

9

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978).

At the time of the killing, felony murder was defined as the unlawful, "reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy." T.C.A. §§ 39-13-201(a) and -202(a)(2) (1991)[2]. A person "acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." T.C.A. § 39-11-302(c).

The proof viewed in the light most favorable to the state establishes that the defendant went to the victim's home to borrow some money from him to purchase drugs. When the victim refused to give him any money, the defendant became upset and began arguing with the victim. The defendant and the victim shoved each other, and when the victim slapped the defendant, the defendant grabbed a knife and stabbed the victim in the chest several times. When the knife broke, the defendant retrieved a second knife and stabbed the victim in the chest again. As the victim was lying on the kitchen floor, the defendant kicked the victim in his head, shoulders and side, and he

---

[2] We note that the provision defining felony murder was amended in 1995 to delete the reckless mens rea element. <u>See</u> T.C.A. § 39-13-202. "No culpable mental state is required for conviction under [the felony murder] subdivision . . . except the intent to commit the enumerated offenses or acts . . . ." T.C.A. § 39-13-202.

also took the victim's box cutter and cut the victim's throat.  Then, the defendant took

the victim's ring, keys, VCR, movies and a wallet containing one hundred and fifty

dollars in cash and a paycheck.  The defendant took the VCR and movies to his home,

gave the ring to his girlfriend, and used the victim's money to buy crack cocaine.  Under

these circumstances, a rational trier of fact could have determined that the defendant

intended to rob the victim once the victim refused to give him any money and that the

killing occurred during the perpetration of the aggravated robbery.  See Mullendore v.

State, 191 S.W.2d 149, 152 (Tenn. 1945) (evidence that the defendant took the victim's

money and appropriated it to his own use permitted the jury to infer that the defendant

intended to rob the victim, although no prior intent to rob was otherwise shown).  We

hold that the proof is sufficient to establish beyond a reasonable doubt the defendant's

guilt for felony murder.


## II.  CONSTITUTIONALITY OF FELONY MURDER STATUTE

Next, the defendant challenges his conviction by arguing that T.C.A. § 39-

13-202(a)(2) is unconstitutional.  He argues that the felony murder statute is overbroad

because a literal reading of the statute authorizes the application of the statute for a

homicide committed in the perpetration of a misdemeanor theft.  First, we note that the

defendant was not charged with or convicted of felony murder relative to a

misdemeanor theft; thus, he is not affected by the part of the law about which he

complains.  Regardless, our supreme court has concluded that the felony murder

statute is constitutional.  State v. Walker, 893 S.W.2d 429, 430 (Tenn. 1995).  This

issue is without merit.


## III.  ADMISSION OF A PHOTOGRAPH OF THE VICTIM

The defendant contends that the trial court erred by admitting into

evidence a photograph of the victim lying in a pool of blood, because it has little or no

probative value.  He also argues that even if the photograph has probative value, it was

11

substantially outweighed by the danger of inflaming the jury and of denying the defendant a fair trial. He asserts that the photograph should not have been admitted into evidence because he did not dispute at trial the cause of death or that he killed the victim and because Sergeant Morris and Dr. Francisco gave detailed descriptions of the location and condition of the body and of the nature and extent of the victim's injuries. The state responds that the photograph was relevant to establish premeditation and deliberation[3] in that it showed the brutality of the defendant's attack on the victim.

The leading case in Tennessee regarding the admissibility of photographs of murder victims is State v. Banks, 564 S.W.2d 947 (Tenn. 1978), in which the supreme court held that the determination of admissibility is within the discretion of the trial court after considering the relevance, probative value and potential unfair prejudicial effect of such evidence. See Tenn. R. Evid. 403. The general rule, as stated in Banks, is that "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Id. at 950-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." Id. at 951.

Thus, even relevant evidence should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Id.; see also Tenn. R. Evid. 403. In Banks, the court stated, "The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." 564 S.W.2d at 951.

---

[3] The defendant was indicted for first degree murder in separate counts alleging alternative theories of first degree murder: premeditated and deliberate murder and reckless killing committed during the perpetration of a robbery. See T.C.A. § 39-13-202(a)(1) and (2) (1991). The jury returned a guilty verdict for felony murder only.

12

The color photograph introduced by the state in this case is from a Polaroid instant camera and is three inches by three inches in size. It shows the victim lying in the kitchen on his back, feet first, with his head almost totally blocked by his body. It is not a close-up shot. The victim is wearing blue jeans and a white tee-shirt, but his feet are bare. There is blood on the lower walls, the refrigerator, and the floor located next to the body. The tee-shirt is partially blood soaked. A closer look discloses cuts on one arm and blood on both forearms. The photograph has a dull quality, without vivid or clear colors.

The record reflects that the prosecutor sought to introduce the photograph of the victim contending that it showed the brutality of the attack and the condition of the victim. He contended that the photograph was relevant to show that the defendant was at home ready for bed when he was attacked by the defendant who came to his door. The prosecutor argued that the photograph was relevant to rebut the defendant's assertion during opening statement that the victim and the defendant began arguing after the victim let the defendant into his apartment. Defense counsel asserted in the opening statement that the proof would show that the killing by the defendant was not premeditated and deliberate but rather was an impulsive and impassioned act. Defense counsel stated that the evidence would establish second degree murder only. In ruling that the photograph was admissible, the trial court stated that the photograph was less obtrusive than another picture offered by the state.[4]

We note that our supreme court has held that the fact that repeated blows or shots were inflicted on the victim is not sufficient, by itself, to establish premeditation and deliberation for a first degree murder conviction. State v. Brown, 836 S.W.2d 530, 542 (Tenn. 1992). The court reasoned that repeated blows can also be delivered in the heat of passion without any design or reflection, and thus, only when the multiple "blows

_____

[4] The second photo offered by the state is not contained in the record.

are inflicted as a result of premeditation and deliberation can they be said to prove first-degree murder." Id. Therefore, based on our supreme court's holding in Brown, we conclude that the photograph was not admissible to establish premeditation and deliberation.

However, our supreme court also stated that photographs of the victim may be admitted "as evidence of the brutality of the attack and the extent of the force used against the victim, from which the jury could infer malice, either express or implied." Id. at 551; see also State v. Smith, 868 S.W.2d 561, 576 (Tenn. 1993) (Trial court did not abuse its discretion by admitting a photograph of the victim when the trial court stated that the photograph was relevant to show "'premeditation, malice and intent because of the multiplicity of these wounds and an obvious intent of whoever was inflicting these wounds.'"). In this case, the prosecution was required to establish that the killing was intentional. See T.C.A. § 39-13-202(a)(1) (1991). Though the defendant admitted killing the victim, he asserted during opening statement that the proof would establish second degree murder but not first degree premeditated and deliberate murder. The picture of the victim demonstrates that the defendant's attack of the victim was a brutal one and thus is probative to the issue of the defendant's intent.

We note that the picture's probative value is somewhat diminished given the other evidence in the case. Sergeant Morris testified that he discovered the victim lying in a pool of blood in the kitchen and that there was blood on the refrigerator, the wall and the floor. Dr. Francisco provided a detailed description of the victim's injuries. The defendant did not contest that he killed the victim or that he inflicted the injuries described by Dr. Francisco. Because this testimony was presented, the admission of the photograph could be viewed as cumulative evidence, and the need for it on the issue of the defendant's intent was minimized.

14

In weighing the probative value of the photograph against its risk of unfair prejudice, though, we do not believe that the single photograph is particularly gruesome or graphic. In our review, we are unable to conclude that its probative value was substantially outweighed by the risk of unfair prejudice. See Tenn. R. Evid. 403. Therefore, we hold that the trial court did not abuse its discretion in admitting the photograph into evidence.

## IV. LESSER INCLUDED OFFENSES

The defendant contends that the trial court erred by denying his request to charge the jury regarding the lesser included offenses of robbery and theft. The state asserts that the trial court properly denied the defendant's requested jury instructions because the record does not support a finding of guilt for either robbery or theft. We agree.

Pursuant to T.C.A. § 40-18-110(a), a trial court is required "to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." When the evidence, introduced by either the state or the defendant, is susceptible of inferring guilt of a lesser grade or class or a lesser included offense of the charged offense, there is a mandatory duty upon the trial court to charge such lesser offense. See T.C.A. § 40-18-110(a); State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996); Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975); State v. Howard, 926 S.W.2d 579, 585-86 (Tenn. Crim. App. 1996). However, the instruction is not required if there is no proof in the record to support a conviction for the lesser offense. Trusty, 919 S.W.2d at 311.

Though we agree that robbery is a lesser grade and a lesser included offense and that theft is a lesser included offense of especially aggravated robbery, we do not agree that the evidence in this case warrants an instruction on either offense.

15

Here, the uncontested proof established that the defendant robbed and killed the victim after the victim refused to give the defendant any money. The evidence establishes that the defendant is either guilty of the greater offense of especially aggravated robbery or not guilty at all. Nothing in the record suggests that the defendant could be found guilty of simple robbery or theft. Therefore, we hold that the defendant was not entitled to an instruction on the lesser offenses of robbery and theft.

## V. CONSTITUTIONALITY OF HEINOUS, ATROCIOUS
## AND CRUEL AGGRAVATING FACTOR

The defendant contends that the "heinous, atrocious, and cruel" statutory aggravating factor as set forth in T.C.A. § 39-13-204(i)(5) is unconstitutional because it is vague and cannot be understood and applied by lay persons serving on the jury. He relies upon Rickman v. Dutton, 854 F. Supp. 1305 (M.D. Tenn. 1994) ("depravity of mind" instruction is unconstitutionally vague without a further limiting instruction). The state notes that Rickman is distinguishable because the instruction given in the present case did not include the "depravity of mind" language. In any event, our supreme court has concluded that the aggravating circumstance under T.C.A. § 39-13-204(i)(5) is constitutional. State v. Odom, 928 S.W.2d 18, 24-26 (Tenn. 1996). This issue is without merit.

## VI. CONSECUTIVE SENTENCING

The defendant challenges the trial court's determination that he should serve his sentence for especially aggravated robbery consecutive to the sentence imposed for his first degree murder conviction. He argues that the trial court should have imposed concurrent sentences. The state contends that the record supports the trial court's determination that the defendant is a dangerous offender and that the record supports consecutive sentences. We agree.

16

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section notes, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. §§ 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

At the sentencing phase of the trial for the felony murder, Gibson County Deputy Jailer John Sporsick testified that he was working when the defendant was held in jail. He stated that the defendant never caused problems and was polite, friendly, and very talkative. He said that he could not have asked for a better inmate. Deputy Jailer Sporsick also expressed the opinion that the defendant was amenable to rehabilitation.

The then twenty-seven-year-old defendant, a high school graduate, testified that he had always had a job and had worked steadily. He stated that his substance abuse problem involving alcohol and marijuana started when he was eighteen years old, and he said that he began using cocaine in 1991. The defendant testified that some of his brothers and sisters also have experienced substance abuse problems. The defendant expressed remorse for committing the offense and stated that he accepted full responsibility for what happened. On cross-examination, the defendant admitted that he initially lied about his involvement in the crimes, but he claimed that he was scared. The defendant asserted that he used drugs usually on the weekends and that his drug use did not interfere with his work performance.

At the sentencing hearing for the especially aggravated robbery conviction, no witnesses testified. The presentence report reflects that the defendant has a prior felony conviction in 1987 for attempt to commit a felony[5]. It also reflects that the defendant admitted that he had used alcohol and marijuana since he was eighteen and that he began using cocaine in either 1992 or 1993. The report shows that the defendant attended counseling and Alcoholics Anonymous meetings as a condition of parole. Regarding the defendant's employment history, the report states that the defendant worked briefly as a cook at a restaurant and as a stocker for a supermarket and also reflects that the defendant had been fired from a factory job. It shows that the

---

[5] The presentence report does not state what felony was attempted. However, it reflects that the defendant was indicted for aggravated rape and received a sentence of three years.

18

defendant worked continuously for approximately two years as a forklift driver before his arrest for the present offenses.

At the conclusion of the sentencing hearing, the trial court sentenced the defendant as a Range I, standard offender to fifteen years, the minimum sentence within the range. See T.C.A. § 40-35-112(a)(1). The trial court stated that it had considered the mitigating and enhancement factors that had been presented and found that they were equally balanced. The trial court concluded that the especially aggravated robbery sentence should be served consecutively to the sentence for life without the possibility of parole because the defendant met all the criteria for dangerous offender status as outlined in Gray v. State, 538 S.W.2d 391 (Tenn. 1976).

The defendant asserts that the trial court failed to make specific findings that would warrant a consecutive sentence, and that the trial court's failure to make such findings warrants the modification of his sentences to be served concurrently. We agree that the trial court should have made more detailed findings as required by the 1989 Criminal Sentencing Act and subsequent case law. However, its reliance upon the Gray criteria reflects its consideration of the appropriate factors.

Consecutive sentencing may be considered if the trial court finds by a preponderance of the evidence that the defendant is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). This finding, along with other considerations must be made. In State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995), our supreme court stated:

> [T]he imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the

19

> consecutive sentences must reasonably relate to the severity of the offenses committed.

These factors were noted in Gray, as well.

As the trial court found, the circumstances of the offenses demonstrate that the defendant had little or no regard for human life and had no hesitation about committing a crime in which the risk to human life is high. When the victim refused to give the defendant any money to buy drugs, the defendant stabbed the victim several times in the chest, penetrating the victim's heart, lungs and ribs. When the knife the defendant was using broke, he began kicking the victim in his head, shoulders and side. The defendant then retrieved a second knife and stabbed the defendant again in the chest. When the victim tried to remove a box cutter from his pocket to protect himself from the defendant's attack, the defendant took the box cutter from the victim and slit the victim's throat, severing his jugular vein. Any one of the types of injuries could have caused the victim's death. These facts establish that the defendant is a dangerous offender under Wilkerson.

The defendant has a prior conviction for an offense that involved a crime against a person and has a history of alcohol and drug abuse. Although the defendant's youth, good school record, and steady work history indicate a capability for rehabilitation, we cannot conclude that the evidence preponderates against the trial court's determination that the criteria for consecutive sentencing exist in this case. Under these circumstances, we conclude that the record sufficiently supports the trial court's consecutive sentencing decision.

In consideration of the foregoing and the record as a whole, we affirm the defendant's judgments of conviction.

_____
Joseph M. Tipton, Judge

20

CONCUR:

_____
David H. Welles, Judge


_____
Jerry L. Smith, Judge